WENDLANDT and others, Plaintiffs, vs. HARTFORD ACCI-
DENT & INDEMNITY COMPANY, Defendant. [Two ap-
peals.]

*June 3—June 22, 1936.*

For the plaintiffs there was a brief by *Bouck, Hilton, Kluwin & Dempsey* of Oshkosh, and oral argument by *Ray C. Dempsey*.

For the defendant there was a brief by *Shaw, Muskat & Paulsen* of Milwaukee, and oral argument by *James D. Shaw*.

NELSON, J. The defendant's appeal will first be considered. The action was tried in March, 1933. The court rendered its decision in September. Judgment was entered in October. The plaintiffs' appeal was fully perfected, and the appeal papers filed in the office of the clerk of the circuit court for Winnebago county early in January, 1934. Prompt request was made to the court reporter to furnish a transcript of the testimony. Between January 11, 1934, and July 30, 1934, no transcript having been furnished, five separate stipulations for orders extending the time in which to settle the bill of exceptions were entered into. The fifth order extended the time to September 1, 1934. On December 31, 1934, an *ex parte* order was entered extending the time to February 28, 1935. On January 23, 1936, pursuant to an order to show cause dated July 29, 1935, the court extended the time to February 26, 1936, upon payment of costs. A copy of the bill of exceptions was served on February 14, 1936, and settled on March 21, 1936.

The defendant contends that no good cause for extending the time to settle the bill of exceptions was shown by the affidavits submitted by the plaintiffs, and that the court therefore erred in extending the time. Sec. 269.45, Stats., as construed by this court, requires that orders extending the time within which any act or proceeding in an action or special proceeding must be taken can be made only upon good cause shown. *Johnson v. Retzlaff,* 200 Wis. 1, 227 N. W. 236; *Eskelinen v. Northwestern C. & S. Co.* 202 Wis. 100, 230 N. W. 33. Such orders may not be granted as matters of grace. It appears from the affidavit of the plaintiffs' attorney and that of the court reporter, submitted at the hearing on the order to show cause, that the plaintiffs' attorney had repeatedly requested the court reporter to furnish a transcript of the testimony, but that the court reporter, due to the press of other business, had been unable to furnish it. While we

have considerable doubt as to the inability of the reporter to furnish a transcript prior to July 26, 1935, when it was finally furnished, the trial court resolved a similar doubt in favor of the plaintiffs. That court was peculiarly conversant with the facts relating to the work of its reporter. The long delay in hearing the order to show cause was due to the illness of the judge. Under all of the circumstances, we cannot say that the order extending the time to settle the bill of exceptions was not for good cause shown.

Since we cannot say that the court erred in extending the time in which to settle the bill of exceptions, the merits of the controversy must be determined.

In order that this controversy may be understood it will be necessary to state the facts fully. The material facts are not in dispute.

The city of New London is a city of the fourth class. At the time of the happening of the events which preceded and led up to the giving of the bond here in question, the plaintiffs Wendlandt and Wright were its mayor and treasurer, respectively. One C. J. Thompson was its city clerk. The Menzies Shoe Company, hereafter called the Shoe Company, was a Wisconsin corporation, engaged in the manufacture of shoes; its factory and principal place of business being in the city of Fond du Lac. Mr. Nichols was its president. Some time prior to July 24, 1926, when the contract hereinafter mentioned was entered into, certain citizens of New London were informed that the Shoe Company was desirous of establishing a branch factory or plant in some city of Wisconsin. The source of the information mentioned does not appear. However, early in July several citizens of New London, motivated by unselfish interests and solely for the purpose of promoting the welfare of their city, went to Fond du Lac and interviewed Mr. Nichols for the purpose of inducing the Shoe Company to establish a branch factory in

New London. Several days later Mr. Nichols visited that city and submitted two written proposals. One proposal involved a bonus of $50,000 and the other a bonus of $100,000. The $100,000 bonus proposal, apparently, was the only one considered by the citizens of New London. The written proposal was not produced upon the trial, so its precise wording is not before us. But from the testimony adduced, and the documentary evidence produced upon the trial, especially the petition hereinafter recited in full in the margin, it is reasonably clear that the Shoe Company proposed, that it would erect a branch factory in the city of New London if the citizens would provide a bonus of $100,000, and assure it free water for a period of five years; that it would operate it; that it would pay out to its prospective employees, during the ten-year period following the completion of the factory, wages amounting to not less than $1,000,000; and that it would furnish a bond to secure the faithful performance of the contract proposed to be entered into. Wide publicity, apparently, was immediately given to the proposal of the Shoe Company, with the result that substantial citizens and taxpayers of the city became enthusiastic over the prospect of obtaining a new industry for their city. A large delegation of citizens called upon the mayor while he was in attendance at a session of the board of review, and urged him actively to support and further the promotion of the project. The raising of $100,000 by popular subscription was considered at the very outset impracticable. A scheme or plan was devised to have the city raise the money and to pay it to the Shoe Company; provided the taxpayers of New London, with substantial unanimity, would sign and file with the city clerk petitions requesting such action by the officers of the city, and would agree to pay, during the five years following, a special tax amounting to two per cent of the assessed valuation of their properties. After such plan was approved by the citizens who were actively engaged in promoting the project, a petition was drawn and large numbers thereof

printed.  A copy of the petition is printed in the margin.[1]

[1] "PETITION.

"*To the Mayor and Common Council of the City of New London, Wisconsin, and to the City of New London:*

"Whereas, the Menzies Shoe Company of Fond du Lac, Wisconsin, has made a written proposal to locate a shoe factory in the city of New London, said written proposal being hereby made a part hereof as though fully set forth and incorporated herein, upon the condition that it be paid and that it receive a cash bonus in the sum of one hundred thousand dollars and free water for a period of five years, for which in return it will erect and equip a factory building within six months of at least twenty thousand square feet of floor space, guarantee a pay roll of at least one million dollars locally during a period of ten years, and to furnish a surety bond in the sum of one hundred thousand dollars to secure the carrying out of the faithful performance of its contract.

"And, whereas, the citizens and taxpayers of the city of New London, realizing that all of them will get value received if said factory is located here and that the city of New London will get additional revenue in taxes, sale of electrical energy, etc., and also realizing that it is practically impossible to raise said one hundred thousand dollars by popular subscription; and also realizing that the only just and equitable way to raise said cash bonus is through the tax roll, using and employing the levying and taxing machinery of the city of New London for that purpose;

"Now, therefore, in consideration of the expected benefits to inure to the taxpayers of this city as a result of said factory to be located here, in the increase of value of our property, in a business way, in the giving of labor employment, and for value received, we, the undersigned taxpayers of the city of New London, hereby constitute and appoint the city of New London, its mayor and common council, our agent and attorney in fact, for the purposes herein set forth, hereby authorizing and empowering them, fully and completely, to place in the tax roll and to levy a special assessment against our property in an amount not to exceed two per cent of the assessed valuation thereof as fixed by the assessor and board of review of said city, and to collect the same at the time and in the manner as general taxes are collected and to use all of the measures provided by statute for the collection of same, in an amount not to exceed one hundred thousand dollars; one per cent to be levied and collected in the tax roll of 1926 payable in January and February, 1927, the balance to be collected and levied and spread over a period of four years.  We also hereby empower and authorize the said city of New London and its governmental agencies and departments to reimburse itself out of the monies so levied and collected for all advances made by it to the Menzies Shoe Company of and on said one hundred thousand dollars; and we hereby approve and legalize in so far as we are concerned all acts and actions taken in reference to this matter by said city of New London in the borrowing of

A large mass meeting of the citizens followed. The plan was fully explained to the meeting. Some of the petitions had already been signed. As a result of the meeting, a large committee was organized for the purpose of canvassing the taxpayers and securing their signatures to the petitions. The assessed valuation of all taxable property within the city at that time exceeded $5,000,000, so the proposed two-per-cent tax would substantially cover the $100,000 bonus proposed to be given to the Shoe Company, and, when paid, would fully reimburse the city. The petitions were signed by nearly all of the taxpayers of the city, and then filed with the city clerk. The names of the signers were compared with the names of the taxpayers and the assessed values of their properties contained in the assessment roll for that year. The checking was done by the mayor and the city clerk, who found, according to the recollection of Mr. Wendlandt, that taxpayers owning ninety-two to ninety-three per cent of all of the taxable properties had signed the petition. Shortly after the petitions were checked, a contract was prepared and entered into by and between the Shoe Company and the officers of the city, acting in their own behalf and in behalf of the citizens of New London. The contract was dated July 24, 1926, and apparently was in accordance with the proposal of the Shoe Company. The material provisions of the contract are printed in the margin.[2]

money, temporarily, etc., in the carrying out of this program; we hereby do this voluntarily and of our own free will and accord.

"Dated at New London, Wisconsin, July 19, 1926.

"Signature of Taxpayer.          Ward.          Valuation."

[2] "AGREEMENT.

I.

"That for a period of five (5) years, beginning six months from the date hereof, the city of New London will furnish water free for all legitimate uses of the branch factory of the Menzies Shoe Company to be erected in the city of New London.

II.

"The citizens of the city of New London do hereby deposit in escrow with the Commercial National Bank in the city of Fond du

' The contract was executed on behalf of the Shoe Company by its president and secretary, and on behalf of the citizens of New London by Mayor Wendlandt, City Clerk

Lac, Wisconsin, the sum of ten thousand ($10,000) dollars, and upon the signing of this agreement, said bank will furnish a receipt for such escrow deposit. Said escrow deposit will remain with said bank until this agreement is ratified at a directors' meeting of the Menzies Shoe Company and is signed by the mayor, city clerk and city treasurer of the city of New London, representing such citizens, and approved by its common council; and such escrow deposit will further remain until the surety bond hereinafter referred to is furnished and approved, whereupon said sum of $10,000 shall be paid to said the Menzies Shoe Company.

### III.

"The citizens of the city of New London, represented by the officials above referred to, will, upon the delivery and approval by such officials representing said citizens of the surety bond hereinafter referred to, pay to said the Menzies Shoe Company the sum of ninety thousand ($90,000) dollars.

### IV.

"The citizens of the city of New London agree hereby to co-operate with the officials of the Menzies Shoe Company to the end that a factory site may be purchased at a reasonable price and the factory erected and put in successful operation—intending hereby that no further financial aid or bonus is expected, but that they will use their best efforts in making a success of the operation of the branch factory as contemplated.

"In consideration of the foregoing, the Menzies Shoe Company agrees as follows:

### I.

"To erect a new substantial factory building in the city of New London, Wisconsin, not of frame or wood, preferably of brick or concrete construction, of at least twenty thousand (20,000) square feet of floor space, including outside dimensions; and the operation of such factory shall begin not later than six (6) months from the date of this agreement.

### II.

"The Menzies Shoe Company further agrees to pay out in wages, locally, in the city of New London, not including wages paid for the construction of the factory building, the sum of at least one million ($1,000,000) dollars within a period of ten (10) years, which ten years shall commence six (6) months after the signing of this agreement; and during each of said ten years, after the first year, it will pay in wages as aforesaid not less than fifty thousand ($50,000) dollars; *but if the amount of wages paid in any one* year falls below fifty thousand dollars, the difference is to be made up the following year; and at least four hundred thousand ($400,000) dollars are to

Thompson, and City Treasurer Wright. At the time the contract was signed by the officers of the Shoe Company, a check of the city of. New London, signed by its mayor and clerk, was deposited in escrow with a Fond du Lac bank to be held by it until certain escrow conditions were complied with. The contract was brought to New London where it was signed by the clerk and the treasurer. Shortly thereafter it was submitted to the common council of the city and approved by it. Mr. Nichols was thereafter informed that the contract was satisfactory, and that he, as president of the company, should immediately arrange for the execution of the bond agreed to be furnished. The bond, copy of which is printed in the margin,[3] was furnished on July 31, 1926.

---

be paid during the first five years of this contract period, beginning six months after its execution.

### III.

"The Menzies Shoe Company agrees hereby to furnish a surety bond, signed by a responsible surety company authorized to do business and furnish bonds of this kind within the state of Wisconsin, in the *penal* sum of one hundred thousand ($100,000) dollars, which bond shall secure the performance on the part of the Menzies Shoe Company of that part of this contract by it to be performed; but it is agreed, however, that the *penal sum* of such bond shall be reduced year by year in the proportion that the wages paid out in any one year bears to the total wages of one million dollars to be paid out in the ten-year period; for instance, in case in any one year ten per cent of the total wages to be paid are paid out, then the principal of the bond is to be reduced ten per cent of the original amount of the bond.

"It is agreed between the parties that the citizens of the city of New London, now represented by the present mayor, city clerk, and city treasurer of said city, shall hereafter and until the complete performance of this contract be represented by the individuals who may at any time be the mayor, city clerk and city treasurer of said city of New London; and they shall act for said citizens by virtue of the office held by them as aforesaid."

### 3 "BOND.

"Know all men by these presents, that we, the Menzies Shoe Company, a Wisconsin corporation, as principal, and Hartford Accident & Indemnity Company, home office, Hartford, Connecticut, as surety, authorized to transact business in the state of Wisconsin, are held and firmly bound unto the citizens of the city of New

A Mr. Wilder represented the defendant company. The bond was signed by the Shoe Company by Mr. Nichols, its

London, represented by the mayor, E. W. Wendlandt, the city clerk, C. J. Thompson, and the city treasurer, L. M. Wright, or their respective successors in office, of such city, *in the penal sum* of one hundred thousand and no/100 ($100,000) dollars, for which payment well and truly to be made the parties hereto bind themselves and their respective successors and assigns, jointly and severally, firmly by these presents.

· "The condition of this obligation is such that

"Whereas, the said the Menzies Shoe Company has entered into an agreement with the citizens of the city of New London, Wisconsin, dated July 24, 1926, a copy of which agreement is initialed and made a part of this bond, and

"Whereas, the said agreement provided for certain obligations to be performed by said the Menzies Shoe Company.

"Now, therefore, if the obligations of said contract shall be performed by said the Menzies Shoe Company for a period of one year from the date hereof, as enumerated in said contract, then this obligation shall be void, otherwise to remain in full force and effect.

"But, this bond shall continue in force for another year, providing, the obligees hereunder, shall within thirty days after the anniversary date of this bond, certify in writing to the surety, that the principal under this bond has not defaulted in any of its obligations to be by it performed during the previous year, and shall be further continued from year to year thereafter, providing the obligees hereunder, shall within thirty days after the annual anniversary date of this bond, certify in writing to the surety that the principal under this bond has not defaulted in any of its obligations to be by it performed during the previous year. Said certification herein referred to must be given by the obligees to the surety, in writing, forwarded by registered mail to its home office in Hartford, Connecticut.

"Provided, immediate notice of any default on the part of the principal coming to the actual knowledge of the obligees or any of them is likewise to be given in the same manner to said surety.

"Signed and sealed this 31st day of July, 1926.

"THE MENZIES SHOE COMPANY,
"by S. D. NICHOLS, President.
"E. B. BOHN, Secretary.
"HARTFORD ACCIDENT & INDEMNITY COMPANY,
"by FRANK S. WILDER,
"Its Attorney in Fact.

"Witnesses:
    "ELLIS N. CALEF.
    "E. B. BOHN.
    "E. WALT.
    "S. D. SPOERKE.
    "NELL GRIMSTAD."

president, and Bohn, its secretary, and by the defendant company by Mr. Wilder, its attorney in fact. The contract and bond were then delivered to Wendlandt, Wright, and Thompson, as representatives of the citizens of New London. In the meantime the council had passed resolutions authorizing its officers to borrow the required moneys. The resolutions recited that the purpose of the borrowing was to pay current expenses thereby purporting to comply with the law. Sec. 67.12, Stats. 1925. The purpose of the resolution, however, clearly was to obtain funds with which to pay the bonus. Many of the taxpayers made advancements to the city, totaling more than $30,000, which the city accepted and for which it gave receipts which could be tendered later on to the city in payment of the special taxes thereafter to be levied pursuant to the authorization contained in the petitions. The $10,000 check deposited in escrow was released and a check of the city for $90,000 was delivered to the company in full payment of the bonus agreed to be paid. Both checks were paid out of the public funds of the city of New London. Immediately thereafter the company commenced to construct a plant in the city of New London. It began to operate as a shoe factory on January 24, 1927. In October or November, 1926, the city officials inserted in the tax roll a special assessment of three fourths of one per cent instead of the one per cent mentioned in the petitions. The city officials did this so as to keep the total tax rate within reasonable bounds. Thereafter the tax roll was placed in the hands of the treasurer. Every one who paid his taxes, except the Wisconsin Cabinet & Panel Company, one of the city's largest taxpayers, paid the special tax. The Panel Company never paid the special tax which was levied the first year. In each of the five years following, one quarter of one per cent was levied as a part of the general taxes and substantially collected. By 1932, the city had been reimbursed the

$100,000 which it had contributed to the Shoe Company. The special tax which the Panel Company did not pay in 1927, as well as the interest on the bank loans, were absorbed by the city out of its funds. The Shoe Company breached its contract in 1930, and thereafter payment of the amount asserted to be due on the bond was demanded of the defendant company.

The officers of the city of New London, including the members of its common council, all of the subscribers to the petitions, the officers of the Shoe Company, and Mr. Wilder, attorney in fact of the defendant company, concededly knew of the details of the plan and scheme which was to provide free water for a period of five years and a bonus of $100,000 to be paid by the city.

The defendant interposed several defenses and partial defenses to the action, among which was the claim that the contract between the company and the citizens of New London was against public policy and illegal, and the bond which secured it was so closely connected with the contract and so much a part of the whole scheme and plan as to be tainted with illegality.

The court in its decision, after fully reciting the facts, held that the contract between the citizens of New London and the Shoe Company, involving the city itself and its principal officers, who accepted the responsibility of representing the citizens, was permeated with illegality, and that the bond given to secure it was so closely connected with it as to require the holding that it was infected with illegality and was therefore void and unenforceable.

It is conceded that the agreement relating to the furnishing of free water by the city of New London for a period of five years was illegal and void; that the action of the officers of the city of New London in paying $100,000 as a bonus to the Shoe Company was illegal; and that the council was with-

out authority to borrow money for the purpose of providing funds with which to pay the bonus; so with respect to these matters there is no need for extended discussion. The concessions are obviously compelled.

The plaintiffs, however, contend that the provision of the contract relating to the furnishing of free water by the city is separable from the remainder of the contract, and that the remainder of the contract is legal when that illegal provision is eliminated therefrom. The courts, under certain circumstances, have held illegal portions of a contract separable and, after eliminating that which is illegal, have upheld the remainder. *Birmingham Railway, Light & Power Co. v. Pratt & McCurdy,* 187 Ala. 511, 65 So. 533; *Conradt v. Lepper,* 13 Wyo. 473, 81 Pac. 307, 82 Pac. 2; *Minnesota Sandstone Co. v. Clark,* 35 Wash. 466, 77 Pac. 803; *Shevalier v. Doyle,* 88 Neb. 560, 130 N. W. 417; *Fryer v. Harker,* 142 Iowa, 708, 713, 121 N. W. 526; *Huber v. Culp,* 46 Okla. 570, 149 Pac. 216; *Choctaw, O. & G. R. Co. v. Bond* (C. C. A.), 160 Fed. 403; *Packard & Field v. Byrd,* 73 S. C. 1, 51 S. E. 678, 6 L. R. A. (N. S.) 547. But see *Menominee River B. Co. v. Augustus Spies L. & C. Co.* 147 Wis. 559, 571, 132 N. W. 1118, 1122, where it was said:

"If any part of the consideration for a promise be illegal, or if there are several considerations for an unseverable promise one of which is illegal, the promise, whether written or oral, is wholly void, as it is impossible to say what part or which one of the considerations induced the promise."

Under the facts and circumstances of this case, it is doubtful whether the agreement to furnish free water to the Shoe Company properly could be considered separable. That provision was in compliance with the proposal and demand of the Shoe Company, and, in our view, constituted a material part of the consideration. But even assuming that separability were proper, the remainder of the contract is, in our opinion, illegal.

The plaintiffs next contend that the bond was subsequent and collateral to and wholly independent of the illegal transactions, namely, the paying of the $100,000 bonus by the city to the Shoe Company, the approval of the contract containing the provision as to free water by the council, and the borrowing of moneys from the banks under the pretense that such borrowings were for current expenses; and that the bond constituted a separate and distinct contract entered into between the citizens and the defendant company upon a new and separate consideration, namely, the payment of a premium or premiums by the Shoe Company, and that it was therefore not permeated or infected with the concededly illegal acts. With that contention we cannot agree. The furnishing of a bond to secure the contract proposed to be entered into and finally entered into was, at the very outset, promised by the Shoe Company in its written proposal. The petition, submitted to the citizens and signed by them, referred to the written proposal of the Shoe Company and made it a part of the petition as though fully set forth and incorporated therein, and, in addition, specifically recited that the Shoe Company was "to furnish a surety bond in the sum of $100,000 to secure the carrying out of the faithful performance of its contract." The promise of the Shoe Company to furnish a surety bond was obviously the motivating force which induced the citizens with such unanimity to sign the petitions and to promise therein to reimburse the city to the extent of a two-per-cent tax to be levied on their properties in the future. The bond was in contemplation from the very outset and was so clearly a part of and so closely and directly connected with the whole illegal scheme or plan as to compel the conclusion that it was infected with and contaminated by illegality. In *McBlair v. Gibbs,* 17 How. (58 U. S.) 232, 236, it was said:

"It may be admitted that even a subsequent collateral contract, if made in aid and in furtherance of the execution of

one infected with illegality, partakes of its nature, and is equally in violation of law."

In *Coppell v. Hall,* 7 Wall. (74 U. S.) 542, 559, it was said: "Wherever the contamination reaches, it destroys."

Under the facts here, the close connection between the illegal acts sought to be accomplished, and which were in fact accomplished, and the contract and bond appear without question. Just who originated the scheme or plan which was carried out does not appear, but when Mr. Nichols, on behalf of the Shoe Company, proposed to build a branch factory in New London, to enter into a contract promising to pay to its prospective employees $1,000,000 in wages during the ten years following the completion of the factory, and offered to furnish a surety bond to insure the faithful performance of such contract upon condition that the Shoe Company would be given a bonus of $100,000 and free water for a period of five years, the scheme was definitely formulated. It was definitely determined at the outset that it would be impracticable to raise $100,000 by popular subscription, so the scheme of inducing the city to provide the necessary funds was launched. The petitions to the common council followed. The obvious inducements to the signing of those petitions were the promise of the Shoe Company to pay a million dollars in wages to its prospective employees, and the promise of the Shoe Company to furnish a surety bond to secure the faithful performance of its contract. Those were the promises that prompted the citizens to induce the city to provide the required funds. When the mayor, clerk, and treasurer, and the other citizens knew that the officers of the city would take the required steps to provide the funds necessary to pay the bonus, those officers, in their own behalf and in behalf of the other citizens of New London, entered into the contract, well knowing that the bonus was not to be paid by the citizens, but was to be paid by the city. When the contract was entered into it was approved by the council.

The execution of the bond originally promised and agreed by the contract to be furnished was then requested. It was furnished and became, as was contemplated originally and during the pendency of the whole movement, the very foundation upon which the whole superstructure of illegal acts rested. Without the proposal to give the bond, the citizens in all probability would not have signed the petitions, would not have agreed to reimburse the city, would not have induced the city officers to act illegally, and would not have authorized the mayor, treasurer, and clerk to enter into the contract in their behalf. In our opinion the bond, though fair and legal on its face, is so permeated with illegality as to render any right asserted thereunder unenforceable.

However well intentioned the citizens of New London were in attempting to promote the well-being of their city by inducing a new industry to locate there, such concededly good intentions on their part cannot conceal the fact that the whole tendency and character of the plan and scheme was to induce the officers of the city of New London, including the members of its council, to act officially but clearly contrary to the prohibitions of the statutory law of this state and against public policy as universally declared. To permit a recovery on the bond here would, to say the least, tend to encourage the citizens of other municipalities throughout the state, under the stress of excitement and dominated by so-called public-spirited motives, to induce their officers to act contrary to law and to public policy. It would be utterly impossible accurately to predict all the vicious results that would flow from our approving as legal the contract and bond herein. *McMullen v. Hoffman,* 174 U. S. 639, 19 Sup. Ct. 839, 851.

That the plan or scheme carried out violated sound public policy is clear. Mr. Williston states the rule thus (vol. 3, p. 3055, § 1750):

"Even though a contract does not directly require any unlawful or improper act for its performance, if the tendency

of the contract is to encourage or hold out a reward for a result that can be brought about only by an unlawful act, the contract is opposed to public policy."

And on page 3057, that learned author says:

"A contract though in itself neither unlawful in what it promises, nor in the consideration for the promise, may be obnoxious as part of a general scheme to bring about an unlawful result, or may be closely connected with some unlawful plan or act. There is no doubt that on the first assumption, the contract is unlawful. Where the contract is merely collaterally connected with an unlawful purpose or act, the rule generally adopted is that where the contract is only remotely connected with an unlawful transaction and rests upon an independent and legal consideration, and the plaintiff can establish his case without relying upon the unlawful transaction, the contract is valid."

The rule is stated thus, in 13 C. J. p. 443, § 379:

"A contract is invalid as against public policy, the tendency of which is to induce a breach or neglect of official duty; and this is particularly true where the consideration is an express engagement on the part of the officer to perform an unlawful act or otherwise to violate his official duty."

The reasons for denying recovery on an illegal contract, or on promises or agreements so closely connected with it as to be a part of the scheme, was well stated in *McMullen v. Hoffman, supra:*

"We must, therefore, come back to the proposition that to permit a recovery in this case is in substance to enforce an illegal contract, and one which is illegal because it is against public policy to permit it to stand. The court refuses to enforce such a contract and it permits defendant to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest. It has been often stated in similar cases that the defense is a very dishonest one, and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public considerations and in order the better to secure the public against dishonest

transactions. To refuse to grant either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly toward reducing the number of such transactions to a minimum. The more plainly parties understand that when they enter into contracts of this nature they place themselves outside the protection of the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be to enter into them. In that way the public secures the benefit of a rigid adherence to the law."

Since we are of the unanimous opinion that the bond under which recovery is sought by the plaintiffs is infected and permeated with illegality and is null and void, it is unnecessary for us to consider the other questions discussed in the briefs of counsel.

*By the Court.*—The order and the judgment are affirmed.