CITY OF TYNDALL, Appellant, v. SCHUURMANS, Respondent

(56 N. W.2d 693)

(Files Nos. 9299 and 9309.  Opinion field January 27, 1953)

Rehearing denied March 16, 1953

**Frank Vladyka, Jr.,** Tyndall, **Fellows** & **Fellows,** Mitchell, for City of Tyndall, Appellant and Cross-Respondent.

**W. W. French** and **Louis B. French,** Yankton, for William Schuurmans, Respondent and Cross-Appellant.

SMITH, J.  This action by the city of Tyndall upon the written guaranty by defendant, Wm. Schuurmans, of the promise in writing of the Community Hospital Association of Tyndall to pay the city $1,000 resulted in a judgment for defendant on the ground that the contract was tainted with illegality.  After developing the undisputed facts, we shall separately state and consider the propositions upon which the city predicates its appeal.

In 1948 the people in and in the vicinity of the city of Tyndall felt the need of a hospital.  To establish and maintain such an institution the Community Hospital Association of Tyndall was incorporated.  From donations it acquired a site in the city, hospital equipment costing $9,958, unpaid subscriptions in the amount of $13,000, and $9,000 in cash.  At this stage in the promotion it was determined that the hospital should be constructed and owned by the city.  For the construction of the building the electors of Tyndall

authorized an issue of general obligation bonds in the aggregate amount of $75,000. Thereafter plans and specifications were prepared and bids were received. Those bids were opened at a meeting of the city council April 1, 1949. The minutes of that meeting record that "The following members of the Hospital Association were present: Mike Schmitt, L. C. Colgan, Ray Post, E. M. Witt, John Kostel, Dr. Brown, and B. L. Farus" and they further recite that "After considering said bids, it was found that the bids of Wm. Welfl, Henkel Construction Company and Fred Breer for General Construction and Tyndall Hardware Co. for heating and plumbing were the lowest bids submitted. It was therefore moved by Metzger and seconded by Duncan that all of the certified checks submitted by the bidders be returned to them, except the lowest bidders herein named. Carried." Whereupon the meeting adjourned.

The bid for general construction was $74,903.50, and for plumbing and heating was $24,364.84. The interested persons had then ascertained that under the limitations fixed by Sec. 4, art. XIII of the constitution of South Dakota the city of Tyndall could not incur a debt in the premises in excess of about $42,000.

Shortly after the described meeting of the city council the Community Hospital Association prepared and executed forty identical instruments reading as follows: "For and in consideration of the City of Tyndall, South Dakota, a public corporation, entering into a contract for, and the construction of, a hospital in said City of Tyndall, South Dakota, the undersigned Community Hospital Association, a corporation, of Tyndall, South Dakota, does hereby agree to pay a part of the cost of the construction of said hospital, and does hereby promise to pay to the said City of Tyndall, South Dakota, or order, on October 1st, 1949 the sum of One Thousand Dollars." Each of these instruments included an indorsement in words as follows: "I, the undersigned, do hereby guarantee and assure to the City of Tyndall, South Dakota the payment in full of the above and foregoing note in the event that the said maker thereof should neglect or refuse to pay the same." Wm. Schuurmans, defendant above named, signed the last quoted agreement endorsed on one of these

instruments. The remaining instruments were executed respectively by different individuals in like manner.

On the 13th of April 1949 a further meeting of the city council was held which was attended by the board of directors of the Community Hospital Association. The board of the association at that time proposed that the association would deliver the above described forty instruments to the city and it would also transfer, assign and convey to the city all of its above described assets in consideration of the city's issuing its general obligation bonds in the aggregate amount of $42,000 and proceeding with the construction of the hospital. The minutes of the meeting record this offer by the board of the association, its acceptance by the city, the letting of the contracts for general construction, for the plumbing and heating to the lowest bidders at the figures hereinbefore mentioned, and instructions to the mayor and city auditor that they enter into contracts with the successful bidders.

Thereafter, the hospital association carried out its proposal except that instead of assigning its unpaid subscriptions, it continued to receive payments from the subscribers and to remit the proceeds to the city. The city on the other hand entered into contracts with the successful bidders under date of April 13, 1949 which obligated the city to pay to the contractors for their performance the respective sums of $74,903.50 and $24,364.84 "in current funds." It also issued its general obligation bonds in the principal sum of $42,000.

The building was completed but the association was unable to pay its notes. Wm. Schuurmans and certain others of the individuals who signed as guarantors refused to pay, and litigation resulted.

The fifth conclusion of law of the trial court reads as follows:

"That the object and purpose of said promissory note and the indorsement thereon were to induce the City of Tyndall to immediately enter into contracts for the construction of the proposed hospital which contracts would violate the inhibitions and restrictions imposed upon the said City of Tyndall by the Constitution and statutes of the

State of South Dakota. That said promissory note and the indorsement thereon were for an illegal purpose and the defendant is not estopped to assert the defense of illegality, and that the Court will not lend its aid in furtherance of the object, purpose and plan under which such note and indorsement were executed and issued."

The city concedes the abstract principle that a guarantor or surety may assert the illegality of the contract of his principal. SDC 26.0113. Therefore, we ignore the contract of Schuurmans and view the assignments of error as dealing solely with the promissory note of the hospital association.

■ A contention of the city is that it could legally obligate itself in an amount equal to the donations received toward the cost of the hospital without creating a debt within the limitation of § 4, art. XIII of the constitution of South Dakota reading: "The debt of any county, city, town, school district, civil township or other subdivision, shall never exceed five (5) per centum upon the assessed valuation of the taxable property therein, for the year preceding that in which said indebtedness is incurred." The argument is that the donated cash, notes and subscriptions constituted a fund dedicated to the payment of the indebtedness the city had contracted in consideration of the construction of the hospital, which fund the city could not legally divert to a different purpose, and therefore the rationale of the case of Williamson v. Aldrich, 21 S. D. 13, 108 N.W. 1063, at page 1064, and of Farrar v. Britton Independent School District, 72 S. D. 226, 32 N.W.2d 627, at page 629, dealing with sinking funds is applicable.

In Williamson v. Aldrich, supra, it was written,

"It being quite apparent that the primary object of the act restricting such public indebtedness to 5 per centum on the assessed valuation of taxable property was to protect the taxpayer and prevent improvident officers from impairing municipal credit, it seems reasonable to infer that the framers of the Constitution placed the limitation on actual municipal indebtedness for the payment of which taxes must be levied in the future, and not upon apparent indebtedness for the payment of which money has been collected in the sinking fund. It, therefore, follows that in estimating

the authorized indebtedness of the city the amount in the hands of the treasurer belonging to the sinking fund and applicable only to the payment of specific debts should be deducted from the aggregate indebtedness of the city * * *."

As applied to such a dedicated fund consisting of cash or its equivalent, we do not question the validity of the position of counsel. Pressed to the point where credit is claimed for the portion of this fund represented by notes and subscriptions, as against the absolute promise of the city to pay the contractors for the performance of their contracts, we think the position untenable. The inescapable fact is that actual debt is not neutralized by a fund made up of such questionable assets. Such a dedicated fund fails to afford the taxpayer the absolute protection intended by this debt-prohibiting provision of the constitution under consideration. If it be thought that this provision is unduly restrictive, relief should be sought through the process of amendment. The courts should not be asked to whittle away its protection to the taxpayer by questionable holdings.

■■ Another contention of the city is founded upon a principle stated in 17 C.J.S., Contracts § 276, p. 663, in words as follows:

"An agreement will be enforced, even if it is incidentally or indirectly connected with an illegal transaction, provided it is supported by an independent consideration, or if plaintiff will not require the aid of the illegal transaction to make out his case; * * *."

Predicated upon this accepted principle, it is argued that the promissory note is supported by a good consideration and was valid when made and delivered, and that upon completion of the hospital a cause of action accrued to the city which is independent of the means the city employed in bringing about that promised result. To establish this cause of action, we are told, all the city was required to do was to introduce the note and prove that the city had constructed a hospital; in other words, it is urged that the real consideration for the note was the construction of the hospital and the city did not need the aid of the incidental contracts with the builders to make out its case. It is also pointed out that the terms of the promissory note would have been satisfied

if the city had made contracts free from any taint of illegality, for example, a contract which required the contractors to look to the dedicated fund for all payments in excess of $42,000.

It is our view that this argument and the principle upon which it is based are unavailing in the circumstances found by the court. As we have indicated, as part of its fifth conclusion the court found: "That the object and purpose of said promissary note and the indorsement thereon set forth were to induce the City of Tyndall to immediately enter into contracts for the construction of the proposed hospital which contracts would violate the inhibitions and restrictions imposed upon the said City of Tyndall by the Constitution and statutes of the State of South Dakota."

In Williston, Contracts, Rev.Ed., § 1753, it is written:
"The test is often suggested, as determining whether the relation of an illegal transaction is sufficiently close to the plaintiff's alleged cause of action to preclude recovery, that if enforcement of the plaintiff's claim does not require aid or proof of the illegal bargain or transaction, the plaintiff may recover. As a negative test this seems sound; that it, a plaintiff cannot be allowed to recover if as part of his case he is compelled to allege and prove unlawful acts or bargains, but the converse does not seem equally true. Even though his case can be made out without indicating anything unlawful, proof must be admissible. to show that the plaintiff is endeavoring to .enforce an obligation which is part of, or so closely connected with an unlawful plan, as to make recovery opposed to public policy."

And § 1752 of that text includes the following:
"A bargain though in itself neither unlawful in what it promises, nor in the consideration for the promise, may be obnoxious as part of a general scheme to bring about an unlawful result, or may be closely connected with some unlawful plan or act. There is no doubt that on the first assumption, the bargain is unlawful."

These principles were applied by the Wisconsin court in Wendlandt v. Hartford Accident & Indemnity Co., 222 Wis. 204, 268 N.W. 230, 237; a case where the bargain was that if the city would pay a bonus of $100,000 in cash a company

would (1) establish a factory in the community; (2) pay out not less than $1,000,000 in wages in a ten-year period, and (3) furnish a bond to assure the performance of the bargain. Upon petition of over 90% of the taxpayers the city made the illegal loan and payment and received a surety bond. The venture failed and after the factory had closed the action was by citizens and taxpayers on the bond. In upholding the trial court's refusal to enforce the bond, the court wrote much that is apposite here. We quote:

"* * * It (the bond) was furnished and became, as was contemplated originally and during the pendency of the whole movement, the very foundation upon which the whole superstructure of illegal acts rested. Without the proposal to give the bond, the citizens in all probability would not have signed the petitions, would not have agreed to reimburse the city, would not have induced the city officers to act illegally, and would not have authorized the mayor, treasurer, and clerk to enter into the contract in their behalf. In our opinion, the bond, though fair and legal on its face, is so permeated with illegality as to render any right asserted thereunder unenforceable."

And the court further wrote:

"However well intentioned the citizens of New London were in attempting to promote the well-being of their city by inducing a new industry to locate there, such concededly good intentions on their part cannot conceal the fact that the whole tendency and character of the plan and scheme was to induce the officers of the city of New London, including the members of its council, to act officially but clearly contrary to the prohibitions of the statutory law of this state and against public policy as universally declared. To permit a recovery on the bond here would, to say the least, tend to encourage the citizens of other municipalities throughout the state, under the stress of excitement and dominated by so-called public spirited motives, to induce their officers to act contrary to law and to public policy. It would be utterly impossible accurately to predict all the vicious results that would flow from our approving as legal the contract and bond herein. McMullen v. Hoffman, 174 U. S. 639, 19 S.Ct. 839, 851, 43 L.Ed. 1117."

And it also wrote as follows:

"The reason for denying recovery on an illegal contract, or on promises or agreements so closely connected with it as to be a part of the scheme, was well stated in McMullen v. Hoffman, supra: 'We must therefore come back to the proposition that to permit a recovery in this case is, in substance, to enforce an illegal contract, and one which is illegal because it is against public policy to permit it to stand. The court refuses to enforce such a contract, and it permits defendant to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest. It has been often stated in similar cases that the defense is a very dishonest one, and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public considerations, and in order the better to secure the public against dishonest transactions. To refuse to grant either party to an illegel contract judicial aid for the enforcement of his alleged rights under it tends strongly towards reducing the number of such transactions to a minimum. The more plainly parties understand that when they enter into contracts of this nature they place themselves outside the protection of the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be to enter into them. In that way the public secures the benefit of a rigid adherence to the law.' "

It is the direct relation which the trial court found to exist between the forty promissory notes and the illegal action of the city officials which tainted this note with illegality, and justified the trial court, in furtherance of public good, to refuse judicial aid to the city. Cf. Oakes Nat. Bank v. Farmers State Bank, 52 N. D. 49, 201 N.W. 696. The court basis were retained. It is all too clear that intervening that that those who devised and carried out the illegal scheme were well intentioned and were seeking to accomplish a result from which great benefits would accrue to community. The constitutional policy the court was bound to uphold makes no exception of indebtedness incurred with good intentions for wholesome purposes.

▪ The contention of the city that the evidence is insufficient to support the findings of fact embraced in the

court's fifth conclusion of law quoted supra seems utterly untenable. The proceedings of the city looking to the letting of contracts for the construction of the proposed hospital were recessed on April 6, 1949. The certified checks of the low bidders who were offering to contract on a particular basis were retained. It is all too clear that intervening that meeting and its reconvention on April 13th a plan had been conceived and preparation had been made to put it into execution. The offer of the notes and other assets was made and accepted; the particular bids which had been pending were also accepted; and the offending contracts were promptly made. The inescapable inference from these circumstances is that all was done on that day by the city officials and the board of the association was according to a preconceived plan. The promissory notes were the most vital element of that plan. Without them the excessive indebtedness would not have been contracted.

■ The last contention of the city is that the defendant is estopped to plead the defense of illegality because he stood by and watched the construction of the hospital by the city without repudiating his contract. In the public interest, and not as a benefit to a defendant, the courts refuse to adjudicate rights under an illegal contract. Minnesota D. & P. R. Co. v. Way, 34 S. D. 435, 148 N.W. 858, L.R.A.1915B, 925. The doctrine of estoppel by conduct has no application to an agreement which is illegal because it violates an express mandate of law. 12 Am.Jur. Contracts § 222; 17 C.J.S., Contracts § 279. The contention is inadmissible.

In view of the foregoing it will not be necessary for us to consider the assignments of error asserted by Wm. Schuurmans in his separate appeal.

The judgment of the trial court is affirmed.

ROBERTS, P. J., and RUDOLPH, J., concur.

SICKEL and LEEDOM, JJ., dissent.

SICKEL and LEEDOM, JJ. (dissenting). We disagree with the majority of the court in the disallowance of the notes and subscriptions in the hospital fund as a credit against the city debt. We think they are a proper offset under the record before us and the rule of law discussed at 64 C.J.S., Muncipal Corporations, § 1849d.

Since a municipality is authorized to accept gifts toward the construction of a hospital, SDC 45.0201 (13), and SDC 45.0202(2) as amended, and usual business procedures involve taking promises to pay in the form of subscriptions and notes, a court in our opinion is not warranted in assuming without evidence that such promises to pay will not be performed.

The debt incurred by the city for construction of the hospital amounted to $99,268.34. Toward this cost the city legally issued bonds for $42,000. Then to avoid a violation of the constitutional debt provision the governing body in cooperation with interested citizens created the other fund not dependent on taxation to pay the additional cost of $57,268.34. This fund consisted of forty $1,000 notes of the hospital association, each guaranteed by a citizen of the community, $9,000 cash and $13,005 in citizens' subscriptions of less than $1,000 each. When the contracts for hospital construction were signed the fund of notes, subscriptions and cash amounted to $62,005, whereas the debt against which these assets were to be applied was only $57,268.34. At the time of trial it was stipulated into the record that of the $40,000 in notes, $28,300 exclusive of interest had been paid leaving unpaid notes of $11,700; and that $8,810 had been paid on the $13,005 subscriptions leaving $4,195 unpaid. By the time of trial collections on the notes and subscriptions amounted to $37,110 and with the $9,000 cash reduced the nontaxable debt of the city ($57,268.-34) to $11,158.34. Against this debt there remained for the benefit of the fund at time of trial $4,195 of citizens' pledges and $11,700 of guaranteed notes or a face value of $15,895 to cover the $11,158.34 debt.

This record of payment in itself in the absence of evidence that the promisors are insolvent compels the conclusion that the fund set up to take care of the nontaxable cost of the hospital is a solvent and an adequate fund. The majority opinion presumes the insolvency of the debtors, whereas an established rule of evidence presumes a debtor's solvency. 20 Am.Jur., Evidence, § 241. Furthermore since this court has held that the constitutional limitation operates only "on actual municipal indebtedness for the payment of

which taxes must be levied", Williamson v. Aldrich, 21 S. D. 13, 17, 108 N.W. 1063, 1064, quoted in the majority opinion, it seems entirely logical that the respondent here, whose case depends on the inadequacy of a fund shown by appellant to be lawfully created and prima facie adequate to avoid a constitutional violation, would have the burden of proving that the debt is in fact a taxable debt. This would require respondent to show the nontaxable fund inadequate and its debtors insolvent. Respondent has not met this burden.

As we view this record there was no illegal contract on the part of the city and therefore no taint of illegality in the respondent's promise to pay the note. He therefore should be required to pay as he promised to pay. Such holding would be well within the precedent set by this court in re Opinion of the Judges, 38 S.D. 635, 162 N.W. 536 and in addition free of even the remotest possibility of casting a burden of taxation on the taxpayers. This action does not involve municipal liability.