STATE EX REL. WISCONSIN DEVELOPMENT AUTHORITY and others, Respondents, vs. DAMMANN, Secretary of State, Appellant. [Three cases.]

*October 15, 1937—January 11, 1938.*
*April 15—June 21, 1938.*

*Harold E. Stafford* of Chippewa Falls, special counsel, for the appellant.

For the respondents there were briefs by the *Attorney General, John Ernest Roe* of Madison, special counsel and attorney for the Wisconsin Development Authority, *Norris E. Maloney* of Madison, attorney for intervening relators, attorneys, and *Charles B. Perry* of Milwaukee of counsel, and oral argument by the *Attorney General, Mr. Roe,* and *Mr. Perry.*

Briefs *amici curiæ* were filed by *William Ryan* of Madison; and by *R. M. Rieser, J. W. Rector,* and *Roy G. Tulane,* and *Olin & Butler* of counsel, all of Madison.

The following opinion was filed January 11, 1938:

FRITZ, J.    The ultimate issues involved on these appeals are: (1) Was ch. 334, Laws of 1937, validly enacted by the legislature; and (2) is that act constitutional.

The appellant questions the validity of the enactment of ch. 334, Laws of 1937, by the legislature because on June 16, 1937, as appears from the senate journal, that house attempted to act on the passage of the bill (one purpose of which was to make an appropriation) with but seventeen members present although, on the passage of such a bill in the senate, the attendance of at least twenty members was required to constitute a quorum, under sec. 8, art. VIII, Wis. Const., which, so far as material here, reads:

"On the passage in either house of the legislature of any law which . . . makes . . . an appropriation of public . . . money . . . three-fifths of all the members elected to such house shall in all such cases be required to constitute a quorum therein."

Upon fifteen of the members then present voting for the passage of the bill, it was duly declared passed; a motion for reconsideration was made and defeated; and a motion was adopted ordering the bill messaged immediately to the assembly. Before that was done in fact, a motion was made in the senate on June 18, 1937, to reconsider the action by which the bill was ordered messaged to the assembly, and it was also proposed to expunge the record of the vote purporting to pass the bill from the journal. Then, on a point of order, it was asserted that because less than the number required by the constitution to constitute a quorum on the passage of an appropriation bill were recorded on the question of its passage, the attempted passage was invalid, and the action ordering the messaging of the bill to the assembly was also void. The president *pro tempore* held the point of order well taken; that the attempted passage of the bill was a nullity; and that it reverted to its former status of but an engrossed bill. Thereafter the senate and also the assembly duly passed it with the required quorum in attendance in each house, and it was duly approved by the governor and published.

As there were not sufficient members in attendance in the senate on June 16, 1937, to constitute the quorum required by sec. 8, art. VIII, Wis. Const., to act on an appropriation bill, there was not then in attendance a legislative body capable under the constitution of transacting legislative business in relation to the passage of the bill; and therefore those present were wholly without power to take any such legislative action in relation thereto. Under Rule 16 of the senate, its parliamentary practice was governed by the rules in Jefferson's Manual, one of which reads:

"*Effect of no quorum on questions.* When from counting the house on a division it appears that there is not a quorum, the matter continues exactly in the state in which it was before the division and must be resumed at that point on any future day."

In an explanation of that rule in Cushing's Parliamentary Law, in sections 369 and 370, it is stated:

"When, upon a division, it appears, that a quorum is not present, the question, upon which such division occurs, ordinarily remains undecided. . . ."

Consequently, the attempted passage of the bill in the senate on June 16, 1937, was a nullity. It was as a thing not done at all; and not an act that was but defectively performed by a body possessing the power and the right to perform it perfectly. *Webb v. Carter,* 129 Tenn. 182, 165 S. E. 426; *Wilson v. Atwood,* 270 Mich. 317, 258 N. W. 773; *Heiskell v. Baltimore,* 65 Md. 125, 4 Atl. 116. Therefore, the status of the bill in the senate continued as it was before the votes were taken on June 16, 1937, until that house subsequently acted effectively by voting the passage of the bill when the required quorum was in attendance. By that passage and the subsequent valid action by the assembly and the governor, ch. 334, Laws of 1937, was duly enacted.

For consideration of the questions raised as to the constitutionality of ch. 334, Laws of 1937, it suffices to note the

following matters: These actions were brought to test the validity of that act by seeking to compel the secretary of state to audit thereunder accounts for indebtedness incurred by the Wisconsin Development Authority (hereinafter called the "W. D. A.") to V. M. Murray, Norris E. Maloney, and Howard I. Tuttle, Inc. The accounts are for services performed for the W. D. A. since the enactment of the act, (1) by V. M. Murray in conducting a survey of the resources and facilities of the state for the production, transmission, distribution, and furnishing of light, heat, water, and power in the state; (2) by Norris E. Maloney in promoting and encouraging the creation of a co-operative association in Crawford county to engage in furnishing light, heat, water, and power, and the dissemination of information in relation thereto; and (3) by Howard I. Tuttle, Inc., for mimeographing form letters addressed to the executive officer of each of five hundred eight incorporated cities and villages in the state for the purpose of promoting municipal ownership of public utilities, and the dissemination of information relative thereto.

Prior to the enactment of ch. 334, Laws of 1937, the W. D. A. was incorporated under the general incorporation laws of Wisconsin as a nonstock, nonprofit-sharing corporation for the purpose of promoting and encouraging municipal and co-operative acquisition and operation of all forms of public utilities, and of engaging in the utility business as a holding or as an operating company. Under its articles of organization, membership in the corporation is not open to the public. Neither its members nor its officers are to be chosen by the electors, or appointed by any officer of the state. They are not required to take the oath of office prescribed by sec. 28, art. IV, Wis. Const.; and there is no limitation upon the salaries which may be paid to them or the corporation's employees. By sec. 199.01 of ch. 334, Laws

of 1937 (creating secs. 199.01 to 199.07 and 20.514, Stats.), the W. D. A. was "designated and selected as an instrumentality for the execution of certain duties and functions provided in section 199.03;" and by sec. 20.514, Stats., there was appropriated to the W. D. A. $10,000, and "annually thereafter, beginning July 1, 1937, sixty thousand dollars for the execution of its duties and functions under section 199.03." In sec. 199.03, Stats., it was provided that "subject to the provision of section 199.02" the W. D. A. "shall use and expend the funds appropriated to it by section 20.514 solely for the execution of the following duties and functions." Those duties and functions are stated in subs. (1) to (7) of sec. 199.03, Stats., and may be summarized as follows:

A.—To promote or encourage the organization or creation of, (1) municipal power districts under ch. 198, or (2) of co-operative associations or nonprofit corporations, to engage in the production, transmission, distribution or furnishing of light, heat, water, or power or the rendering of street or interurban railway or bus services;

B.—To promote or encourage the acquisition, ownership, construction, operation, or management of any plant, equipment, or facilities, or part thereof for the production, transmission, distribution, or furnishing of light, heat, water, or power, or the rendering of such railway or bus services, (1) by any co-operative association or nonprofit corporation or any group or combination thereof; (2) or by any municipality, municipal power district, or other political or governmental units of the state, or any group or combination thereof;

C.—To (1) survey the resources and facilities, existing and potentially available, for the production, transmission, distribution, and furnishing of light, heat, water, and power in the state; and (2) make studies and surveys, (a) for the economical development, use, and conservation thereof as will best provide an abundant and cheap supply of these essential services for industrial, agricultural, commercial,

governmental, transportation, and domestic purposes, and (b) for the co-ordination of water-power and fuel-power developments with the regulation of rivers by storage or otherwise for water supply, navigation, flood control, soil conservation, public health, recreational, and other uses;

D.—To collect and disseminate information and engage in research, planning, and educational activities necessary and useful for the execution of the W. D. A.'s duties and functions under sec. 199.03, Stats.; and to co-operate with the federal government and its agencies in the execution of those duties and functions.

It is further provided in the act that the W. D. A. shall not use or expend any of the funds appropriated to it by the state for any activities or functions which would be repugnant to the state constitution if carried on by the state, and that the state shall never be liable or responsible for any debt or obligation of that corporation (sec. 199.02, Stats.); that the accounts and records of the W. D. A. shall be so kept as to clearly distinguish the uses made of funds appropriated by the state, and all disbursements of funds appropriated by the state shall be audited by the secretary of state in the manner provided by law (sec. 199.05, Stats.); and that the W. D. A.'s authority to expend funds appropriated by the state shall terminate in the event its articles of organization shall be amended so as to provide profits for its members, directors, or officers, or so as to change the mode or manner of distribution of its property upon dissolution, or if its articles of organization shall at any time authorize it to engage in, and pursuant thereto it does engage in, any activities except those provided by sec. 199.03, Stats., and those which are part of the acquisition, ownership, construction, operation, or management of any plant, equipment, or facilities for the production, transmission, distribution, or furnishing of light, heat, water, or power, the transmission of telephone messages, or the rendering of street or interurban railway or

bus services, and the furnishing of technical, supervisory, or management services therefor (sec. 199.01, Stats.).

The defendant contends that ch. 334, Laws of 1937, is unconstitutional because it purports to delegate the execution or administration of a statute to the W. D. A., a privately controlled private corporation, organized under our general incorporation laws, which do not authorize incorporation for the purpose of holding public office or empower a corporation to do so. It is fundamental that under our constitutional system the governmental power to execute the laws is vested in the executive department of the state, and can be exercised only by duly constituted officers thereof. By the act in question it was, however, clearly intended to vest the execution thereof in the W. D. A. Thus, it is provided therein that the W. D. A. "is hereby designated and selected as an instrumentality for the execution of certain duties and functions provided in section 199.03" (sec. 199.01, Stats.) ; and that it "shall use and expend the funds appropriated to it by sec. 20.514 solely for the execution of the following duties and functions" (sec. 199.03, Stats.). And that those duties and functions were considered governmental in character clearly appears by implication from the provision that the W. D. A. "shall not use or expend any of the funds appropriated to it by the state for any *activities* or *functions* which would be repugnant to the constitution of the state *if carried on by the state*" (sec. 199.02, Stats.). The proper performance of the duties and functions thus delegated to the W. D. A. necessitates the exercise of discretion and responsibility incidental to the governmental power under consideration that cannot legally be delegated otherwise than to public officers, acting for and as a part of the government under such conditions and control that "they can approach and determine questions impartially, unbiased, and without adverse personal interest." (*Wagner v. Milwaukee*, 177

Wis. 410, 418, 188 N. W. 487.) On the one hand the act appropriates state funds for the use of the W. D. A. in executing its duties and functions thereunder, without any allocation by the legislature or any authorized public officer as to what portions of the funds are to be used by the W. D. A. for one or the other of the activities in which it is to engage in the administration of the act. Likewise, there is no legislative direction as to what circumstances or conditions are to govern that corporation's determination as to the order in which or the extent to which the W. D. A. may engage in those activities, or the methods, means, or agencies by which it will perform them; or what localities or portions of the state, or which of the specified forms of public utility ownership or operation, etc.,— otherwise than by private corporations,— it will favor by its performance of those activities with the use of the appropriated funds. On the other hand, there is no provision in the act directing or authorizing the execution or administration thereof by any public officer or authorizing or requiring him even to supervise the execution or administration by the W. D. A. (which is only required, if and after it acts, to report annually to the governor its activities with the use of appropriated funds; and to have the expenditure thereof audited by the secretary of state). Consequently, there is under the act virtually a complete abdication to the W. D. A. of the state's sovereign power which is exercised in the execution of a statute, including the discretion and responsibilities incidental thereto. It is obvious that, if the act had directed the execution thereof by the governor or any other state officer, his performance of the duties and functions delegated thereby to the W. D. A. would clearly be in the exercise of that sovereign power. Likewise, performance thereof by that corporation under the act as enacted would be in the exercise of that power. Thus, it alone was intended to be the instrumentality authorized

under the act to accomplish the purposes thereof,—which the relators contend are public purposes. If they were but private purposes, the appropriation and use of state funds therefor would be invalid.

Assuming (without, however, here deciding) that the purposes in question are public because the execution thereof is to further the material and permanent interests and welfare of the entire state, and is not of merely private, local, or temporary concern, then the instrumentality so empowered and authorized to be compensated out of public funds is a public officer, under the definition of that term in *Hall v. State,* 39 Wis. 79, 86, to wit:

"When public functions are conferred by law upon certain persons elected by the people or appointed by the legislature, if those functions concern the general interests of the state, and are not of a nature merely local or temporary, such persons are public officers, especially if they are paid a salary for their services out of the public treasury."

In quoting that definition with approval in *In re Appointment of Revisor,* 141 Wis. 592, 608, 124 N. W. 670, the court said:

"There have been many attempts to accurately define an office and differentiate it from a mere employment, but it is manifest that the line is not easy to draw."

That difficulty was encountered in the following cases, cited by the relators in contending that the duties and functions delegated and to be performed under the act are not such as would constitute the instrumentality which is to perform them a public officer, to wit: *United States ex rel. Noyes v. Hatch,* 1 Pin. 182; *United States ex rel. Boyd v. Lockwood,* 1 Pin. 359; *Butler v. Regents of the University,* 32 Wis. 124; *Weise v. Board of Supervisors of Milwaukee County,* 51 Wis. 564, 8 N. W. 295; *State ex rel. Brown County v. Myers,* 52 Wis. 628, 9 N. W. 777; *Sieb v. Racine,*

176 Wis. 617, 187 N. W. 989. Those cases are, however, not in point because there was not involved therein any such delegation of the governmental power to execute or administer a statute as is involved in the case at bar.

For the same reason, such cases as *Wisconsin Industrial School for Girls v. Clark County*, 103 Wis. 651, 79 N. W. 422, and *Loomis v. Callahan*, 196 Wis. 518, 220 N. W. 816, are not in point. They did relate to services performed in the discharge of a public, governmental purpose, but the performance thereof by a private corporation was not the execution or administration of a statute in the exercise of governmental power. As was said in *Fox v. Mohawk & H. R. Humane Soc.* 165 N. Y. 517, 525, 59 N. E. 353, 355: "Of course, the state or any of its subdivisions may employ individuals or corporations to do work or render service for it; but the distinction between a public officer and a public employee or contractor is plain and well recognized." But the execution of the duties and functions of the W. D. A. under the act would not be merely in the nature of work or service performed by an employee or a contractor in the execution of a public project in relation to which the state's administrative functions to determine the character, scope, and what shall constitute performance, etc., thereof have been duly exercised, or reserved for control by its officers. The state can have a private instrumentality construct a highway at public expense when the location, dimensions, and similar essential matters in relation thereto have been determined by or are under the control or supervision of an official vested with its governmental powers in that regard. But the state cannot delegate the determination of such essential matters to an unofficial, private instrumentality with but the direction that it shall use appropriated state funds for the purpose of locating and constructing public highways of some kind, somewhere within the state.

In addition to the reasons stated above for confining the delegation of such duties and functions as the W. D. A. was to execute to public officers, there is in point the statement in *People v. Salem,* 20 Mich. 452, 495, that,—

"For the expenditure of public money the constitution and laws provide public officers and put them under adequate control and security. The money of the people belongs in the custody of the agents of the people. Governments cannot delegate public responsibilities to private and irresponsible hands."

Among the constitutional provisions and laws designed to further such control and security, is sec. 28, art. IV, Wis. Const., which requires all officers "except such inferior officers as may be by law exempted" to take an oath to support the federal and state constitutions "and faithfully to discharge the duties of their respective offices to the best of their ability." Likewise, to that end, it is "a fundamental principle of our government that a person not an elector of the state is ineligible to hold a public office therein, although our constitution and statutes do not expressly so ordain." *State ex rel. Off v. Smith,* 14 Wis. *497; *State ex rel. Schuet v. Murray,* 28 Wis. 96; *State v. Trumpf,* 50 Wis. 103, 108, 5 N. W. 876, 6 N. W. 512. As the W. D. A. is incapable of qualifying in either of those respects, it cannot assume the duties and functions of a public office in this state. Moreover, there is no provision in the general incorporation laws under which the W. D. A. is organized as a private corporation, that authorizes such a corporation to receive or hold public office, or to exercise the duties or functions thereof. Therefore, and in view of the rule that "corporations are the creature of the state and exist with such powers, and such powers only, as the laws of the state of their creation confer upon them" (*Fleischer v. Pelton Steel Co.* 183 Wis. 451, 455, 198 N. W. 444), the W. D. A. is

likewise incapable to receive or assume the official authority to execute the duties and functions delegated to it by the act. Under those circumstances, the decision in *Dade County v. State,* 95 Fla. 465, 116 So. 72, is applicable. The statute then under consideration purported to confer upon a nonofficial commission authority to make plans and estimates for an ocean-front protection and improvement as a public purpose and burden; and to receive and disburse county funds therefor. In holding the attempted delegation of governmental power invalid, the court said (pp. 476, 479) :

"The project contemplated by the act is an administrative function requiring the exercise of sovereign governmental powers. Such powers may legally be exerted only by officials duly commissioned for that purpose. The constitution does not contemplate that essential governmental power or authority may be exercised by a corporate agency whose members are not duly commissioned officers. . . .

"The constitution contemplates that administrative functions that are governmental in their nature involving discretion and responsibility, and not merely clerical or expert assistance, shall be performed by duly commissioned officers."

See also *Schieffelin v. Hylan,* 236 N. Y. 254, 140 N. E. 689, 691.

It follows that the attempted delegation to the W. D. A. of the authority and duty to execute the act on behalf of the state renders it invalid; and that therefore the orders under review must be reversed, and the peremptory writs of *mandamus* vacated.

In the excellent briefs filed herein, other grounds, upon which the validity of the act is questioned, are also given extended and thorough consideration. The questions raised in relation to some of those grounds are of great importance and highly controversial. But as the incapability of the W. D. A. to receive the authority and to execute the act renders the provisions thereof invalid to such an extent that

there remain none by which the legislative intent and purpose thereunder can be accomplished, and as the same legal questions may not arise under an enactment with due regard to the fundamentals of our constitutional system, it is considered unnecessary and inadvisable to decide them until they are presented in a case in which they can be determined under the facts and circumstances then involved.

*By the Court.*—Orders reversed and peremptory writs vacated; and causes remanded with directions to enter an order granting the defendant's motion to quash the alternative writ of *mandamus* in each action.

A motion by the respondents for a rehearing was granted, and the cause was reargued.

*Harold E. Stafford* of Chippewa Falls, special counsel, for the appellant.

For the respondents there was a brief by the *Attorney General, John Ernest Roe* of Madison, special counsel and attorney for the Wisconsin Development Authority, *Norris E. Maloney* of Madison, attorney for intervening relators, attorneys, and *Charles B. Perry* of Milwaukee of counsel, and oral argument by the *Attorney General, Mr. Roe, Mr. N. S. Boardman,* assistant attorney general, and *Ralph M. Hoyt* of Milwaukee, special counsel.

Briefs *amici curiæ* were filed by *William Ryan* of Madison; by *R. M. Rieser, J. W. Rector,* and *Roy G. Tulane,* and *Olin & Butler* of counsel, all of Madison; by *James F. Malone* of Beaver Dam, *Herb J. Smith* of De Pere, and *Frank W. Lucas* of Madison; and by *Lloyd K. Garrison, Jacob H. Beuscher,* and *Ray A. Brown,* all of Madison.

Briefs *amici curiæ* were also filed by the *Attorney General* and *William H. Dietrich, Jr.,* special counsel, for various veterans' associations receiving state aid; by the *Attorney General* and *Ralph M. Hoyt,* special counsel, for various cor-

porations receiving state aid; and by the *Attorney General* and *N. S. Boardman,* assistant attorney general, for the Wisconsin Agricultural Authority.

The following opinion was filed June 21, 1938:

WICKHEM, J. (*on rehearing*). Upon motion for rehearing, a reargument was ordered of the questions deemed determinative by the court in its original opinion. After a careful consideration of the able and exhaustive briefs filed upon rehearing and a complete review of the question, we conclude that we were in error in holding that ch. 334, Laws of 1937, secs. 20.514, 199.01 to 199.07, Stats. 1937, constituted an invalid delegation of executive power to a private corporation and designation of such corporation as a public officer. Upon the original argument the extremely far-reaching and difficult question of the circumstances under which sovereign power might be vested in private persons or corporations was naturally stressed. This question has an extensive history and is of extreme present importance in view of the pressure which the complexities of modern life have put upon all governmental agencies, particularly those of an administrative character, and the demand that relief be sought by delegating to private groups some of the functions of the government. See 51 Harvard Law Review, 201. We are satisfied that in centering our attention upon this very large question we failed to give adequate weight to the extent of the pre-existing corporate powers of the Wisconsin Development Authority. When these are considered in relation to the act, the act must be held to constitute a mere appropriation measure and not to confer sovereign power upon the corporation, or indeed any power at all except to spend the allotted money for purposes defined in the act.

The Wisconsin Development Authority was incorporated under the provisions of sec. 180.01, Stats., which provides:

"Three or more adult residents of this state may form a corporation in the manner provided in this chapter for any

lawful business or purpose whatever, except banking, insurance and building or operating public railroads. . . ."

The articles were filed March 30, 1937. The act was published July 1, 1937. For the sake of convenience we have numbered the purposes stated in subsection A of "Article First," and have put the corresponding provision of the Wisconsin Development Authority Act immediately following:

*Article First.* A (1) provides: "To promote or encourage the organization or creation of municipal power districts in the state under chapter 198 of the Wisconsin statutes."

"199.03 (1) To promote or encourage the organization or creation of municipal power districts in the state under chapter 198."

*Article First.* A (2) provides: "To promote or encourage the organization or creation of co-operative associations and nonprofit corporations to engage in the production, transmission, distribution or furnishing of light, heat, water or power, the transmission of telephone messages, or the rendering of street or interurban railway or bus services."

"199.03 (2) To promote or encourage the organization or creation of co-operative associations and nonprofit corporations to engage in the production, transmission, distribution or furnishing of light, heat, water or power, or the rendering of street or interurban railway or bus services."

*Article First.* A (3) provides: "To promote or encourage the acquisition, ownership, construction, operation or management of any plant, equipment or facilities, or any part thereof, for the production, transmission, distribution or furnishing of light, heat, water or power, the transmission of telephone messages, or the rendering of street or interurban railway or bus services, by any co-operative association or nonprofit corporation, or any group or combination of co-operative associations or nonprofit corporations."

"199.03 (3) To promote or encourage the acquisition, ownership, construction, operation or management of any plant, equipment or facilities, or any part thereof, for the production, transmission, distribution or furnishing of light, heat, water or power, or the rendering of street or interurban railway or bus services, by any co-operative association or nonprofit corporation, or any group or combination of co-operative associations or nonprofit corporations."

*Article First.* A (4) provides: "To promote or encourage the acquisition, ownership, construction, operation or management of any plant, equipment or facilities, or any part thereof, for the production, transmission, distribution or furnishing of light, heat, water or power, the transmission of telephone messages, or the rendering of street or interurban railway or bus services, by any of the cities, villages, towns, municipalities, municipal power districts, or other political or governmental units of the state, or any group or combination thereof."

"199.03 (4) To promote or encourage the acquisition, ownership, construction, operation or management of any plant, equipment or facilities, or any part thereof, for the production, transmission, distribution or furnishing of light, heat, water or power, or the rendering of street or interurban railway or bus services, by any of the cities, villages, towns, municipalities, municipal power districts, or other political or governmental units of the state, or any group or combination thereof."

*Article First.* A (5) provides: "To survey the resources and facilities, existing and potentially available, for the production, transmission, distribution and furnishing of light, heat, water and power in the state; to make studies and surveys for the economical development, use and conservation of such resources and facilities as will best provide an abundant and cheap supply of light, heat, water and power for industrial, agricultural, governmental, transportation

and domestic purposes; to make studies and surveys for the co-ordination of water-power and fuel-power developments with the regulation of rivers by storage or otherwise for water supply, navigation, flood control, soil conservation, public health, recreational and other uses."

"199.03 (5) To survey the resources and facilities, existing and potentially available, for the production, transmission, distribution and furnishing of light, heat, water and power in the state; to make studies and surveys for the economical development, use and conservation of such resources and facilities as will best provide an abundant and cheap supply of these essential services for industrial, agricultural, commercial, governmental, transportation and domestic purposes; and to make studies and surveys for the co-ordination of water-power and fuel-power developments with the regulation of rivers by storage or otherwise for water supply, navigation, flood control, soil conservation, public health, recreational and other uses."

*Article First.* A (6) provides: "To collect and disseminate information and engage in research, planning and educational activities necessary or useful for carrying out any or all of the business and purposes of this corporation."

"199.03 (6) To collect and disseminate information and engage in research, planning and educational activities necessary or useful for the execution of its duties and functions under this section."

*Article First.* B provides: "To assist and co-operate with the state and federal governments and their various agencies, departments and authorities, and the several cities, villages, towns, municipalities, municipal power districts and other political or governmental units of the state of Wisconsin, and persons, firms, associations, corporations, co-operative associations and other organizations in the carrying out

of any or all of the business and purposes of this corporation."

"199.03 (7) To co-operate with the federal government and its agencies in the execution of its duties and functions under this section."

In the articles of incorporation other purposes are specified which may briefly be summarized as follows: To account for the use made of funds received by it from the state or federal government which funds are to be expended only in accordance with the terms of the grant under which they are received; to furnish technical services such as engineering, bookkeeping, etc., with power to enter into contracts for services, etc.; to acquire, manage, and operate plants; the right of condemnation; to borrow money, to draw, make, and indorse, etc.; to acquire by purchase and to hold, pledge, sell, and exchange securities; and to carry out all or any part of the business and purposes as agent or in association with others. At the close of subsection H of "Article First" it is provided that the corporation shall not engage in banking, the investment business, or in the activities of building and loan associations.

Sec. 199.01, Stats., provides:

"Wisconsin Development Authority, a nonstock, nonprofit corporation now in existence, is hereby designated and selected as an instrumentality for the execution of certain duties and functions provided in section 199.03; provided, that such designation and the authority conferred upon said corporation by this chapter shall terminate forthwith if the articles of organization of said corporation shall at any time be amended so as to provide profits . . . ; provided, also, that such designation and the authority conferred upon said corporation by this chapter shall terminate forthwith if the articles of organization of said corporation shall at any time authorize the corporation to engage in any activities . . .

except those provided by section 199.03 and except also those which are part of or in connection with the acquisition, ownership, construction, operation or management of any plant, equipment or facilities, or any part thereof, for the production, transmission, distribution or furnishing of light, heat, water or power, the transmission of telephone messages, or the rendering of street or interurban railway or bus services, and the furnishing of technical, supervisory or management services therefor. . . ."

The foregoing comparison of statutory provisions with corporate powers indicates that at the time of the enactment the corporation was empowered by its articles to do everything that it could do after the enactment of the statute. This being true, we cannot escape the conclusion that the statute conferred no power upon it.

Our attention has been directed to sec. 199.04, Stats., which provides:

"In the performance of its duties and functions under section 199.03 Wisconsin Development Authority shall have access to all available information collected by any department of the state and may call upon the public service commission to obtain further information. The public service commission is hereby authorized to gather such information under section 196.02. The governor may direct that assistance and advice be given said corporation in the performance of its duties and functions under section 199.03 by any officer, agent or employee of any department of the state."

It is a matter of extreme doubt whether merely making accessible to the corporation available information and providing that the governor may direct assistance and advice to be given to the corporation or even the provision that the corporation may call upon the public service commission for further information vests any new powers whatever in the Wisconsin Development Authority. Certainly the provision with reference to the governor vests in him whatever power is given. The only provision that with some color of plausi-

bility may be argued to do this is that which permits the corporation to call upon the public service commission to obtain further information. We do not think it profitable to extend this opinion by speculating whether a scintilla of power is vested in the corporation by this section, and content ourselves with expressing doubt that sec. 199.04 requires any modification whatever of what has heretofore been said in this opinion. There can be no serious contention that such powers as may be granted by this section are sovereign in character. They are relatively trivial and wholly ancillary to the main purposes of the act. If the latter do not vest sovereign power in the corporation, neither does the lesser grant in sec. 199.04, Stats.

Sec. 199.01, Stats., heretofore quoted, designated the Wisconsin Development Authority as the *instrumentality for the execution of certain duties and functions,* and the argument was sufficiently appealing to have originally convinced us of its soundness that this constituted an express designation of the corporation as a public officer and vested it with sovereign power. Upon careful reconsideration, we have determined that the argument cannot stand against the fact that no new powers are given by the act. The use of the words, "For the execution of certain duties and functions provided," etc., is quite generally associated with appropriations to private corporations for public purposes. It occurs in this state in one form or another with respect to the State Historical Society, the State Horticultural Society, the Wisconsin Horse Breeders' Association, the Wisconsin Agricultural Society, the Wisconsin Live Stock Breeders' Association, the Wisconsin Cranberry Growers' Association, etc. The provisions vary somewhat. For the most part, the appropriations are to a particular society and are for the exercise of its functions as provided by law. Sec. 172—85 1, ch. 675, Laws of 1913, makes an appropriation to the

State Horticultural Society, to "carry into effect the powers, duties and functions provided by law for said society." There is no particular significance in the fact that the word "certain" is substituted for "its" or that duties and functions are referred to. They are referred to quite generally in appropriation bills and are for the purpose of limiting the appropriations to specified public purposes and not of conferring sovereign power upon the recipient of the appropriation. The assertion that the word "instrumentality" has significance is quite plausible, but we conclude that the use of this term does not create a material difference between this and other acts appropriating funds to private corporations. The term has been used in judicial opinions to indicate the utilization of corporate assistance by means other than the delegation of sovereign power. *McCullough v. Maryland,* 4 Wheat. 316, 4 L. Ed. 579; *Clendaniel v. Conrad,* 26 Del. 549, 83 Atl. 1036, 1051. In the latter case the court said, at page 596:

"We are unable to see that the state is parting with a part of its sovereignty by providing that a private corporation may construct a highway and give it to the state, when it is done by authority of the state, without expense to the state. If the state may, in the exercise of its sovereign power, provide safe and convenient ways for the public necessity and convenience, why is it not possible for it to secure such ways through the instrumentality of a corporation which is willing to construct and convey them to the state? Instead of parting with its sovereignty by so doing, it seems to us to be in the active exercise thereof."

The most that can be said of the term as used in the statute is that it is ambiguous and inconclusive.

It is contended that at all events new duties are imposed upon the corporation by the act and that from the time of the enactment the corporate powers are used to execute these public duties. By reason of this, it is claimed that the corpo-

ration has acquired new powers, *i. e.,* to exercise its corporate powers as a state agency or officer. Upon examining the statute, however, we find that no duties or functions are imposed upon this corporation except those of using the money appropriated in accordance with the calls of the statute. The corporation could decline the appropriation and wholly fail to exercise that portion of its corporate powers which the appropriation sought to aid, and in so doing it would be guilty of no breach of duty. Its duties are with respect to the spending of the appropriation and can only be breached by a misappropriation. The provisions of sec. 199.01, Stats., are no more significant than somewhat similar provisions in every appropriation bill of like character. The purpose is to make a declaration of public purpose and to limit the appropriation to that purpose. In view of this, it cannot be said that "duties and functions" in the sense contended for were imposed by the act upon this corporation.

Wholly separate and apart from any or all of the foregoing considerations, and assuming for the moment that the act did vest the corporation with new powers, we would be compelled to conclude that the act did not delegate sovereign power. In the original opinion it was stated:

"The proper performance of the duties and functions thus delegated to the W. D. A. necessitates the exercise of discretion and responsibility incidental to the governmental power under consideration that cannot legally be delegated otherwise than to public officers, acting for and as a part of the government under such conditions and control that 'they can approach and determine questions impartially, unbiased and without adverse personal interest.' "

In view of the fact that an important group of purposes under the act is later in this opinion held not to constitute a proper state purpose, it is clear to us that the discretion and responsibility referred to in the original opinion has been so far diminished that what remains could not constitute

a power sovereign in character, if it were held to be a power at all.

In view of the foregoing, it is unnecessary to re-examine the soundness of our original conclusions based upon the assumption that the act delegated sovereign power to the Wisconsin Development Authority. The premise upon which the rule laid down in the opinion rests having failed, the rule itself has no further materiality in this case. It is also unnecessary to discuss in detail the situations of other corporations, such as the Wisconsin Historical Society, state fair associations, veterans' associations, and various other corporations receiving state aid, the appropriations of which are thought to have been put in jeopardy by the original determination of this court. While we have not discovered any such peril as is asserted even if our original position had been adhered to, it is obvious that, if it existed, it has disappeared with abandonment of the position.

In the view that the court takes with reference to the foregoing, it becomes necessary to consider whether the purposes for which the money appropriated by secs. 20.514, 199.03, Stats., may be spent are public purposes. In view of the concession in all the briefs that appropriations must be for a public purpose, it is unnecessary elaborately to consider the constitutional sources of this rule. It suffices to state that the validity of an appropriation must be judged by the validity of any tax which might be levied to support it, and that for the state to appropriate for a private purpose money raised or to be raised by taxation would be to take the property of one citizen or group of citizens without compensation and to pay it to others, which would constitute a violation of the equality clause as well as a taking of property without due process of law.

The rules which determine the approach to this question by a court are extremely liberal. In an early case in this

state, *Brodhead v. Milwaukee,* 19 Wis. *624, *652, it was said:

"To justify the court in arresting the proceedings and declaring the tax void, the absence of all possible public interest in the purposes for which the funds are raised must be clear and palpable—so clear and palpable as to be perceptible by every mind at the first blush."

In *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 549, 90 N. W. 1098, after stating the principle that the determination as to what is in the public interest must rest with the legislature, the court said:

"If a public purpose can be conceived which might rationally be deemed to justify the act, the court cannot further weigh the adequacy of the need or the wisdom of the method."

See also *Payne v. Racine,* 217 Wis. 550, 259 N. W. 437.

The mere fact that the appropriation was to reimburse a private corporation for expenditures incurred by it to effect purposes specified in the act does not render the appropriation invalid if the services are for a public purpose. Appellant's contention to the contrary is based upon the decisions in such cases as *Curtis v. Whipple,* 24 Wis. 350, and *Whiting v. Sheboygan & Fond du Lac R. Co.* 25 Wis. 167. The appropriation in each of these cases contained no continuing limitation or control to insure that the funds would be used solely for a public purpose. When, however, the appropriation is solely for a public purpose and is under proper governmental control and supervision, it is not invalid merely because it is paid to or through a private corporation or agency. In *Wisconsin Industrial School for Girls v. Clark County,* 103 Wis. 651, 667, 79 N. W. 422, the court said:

"The test to be applied in determining whether a particular agency may be employed by the state or some particular subdivision thereof by legislative authorization, to perform

any particular work, is not whether the agency is public, but whether the purpose is public within the legitimate functions of our constitutional government. If the purpose be public and constitutional, and the agency be an appropriate means to accomplish it, and not expressly or by necessary implication prohibited by state or national constitution, its employment, under reasonable regulations for control and accountability to secure public interests, is legitimate and constitutional."

See also *State ex rel. La Crosse Public Library v. Bentley*, 163 Wis. 632, 158 N. W. 306; *Loomis v. Callahan*, 196 Wis. 518, 220 N. W. 816.

Practical construction sanctioning such appropriations to privately owned or controlled organizations or associations for public purposes is afforded by ch. 5, Laws of 1853, creating the Wisconsin State Agricultural Society as a body corporate and allowing it to use a room in the capitol building; ch. 16, Laws of 1854, appropriating $500 to the State Historical Society for books, maps, and other paraphernalia illustrative of the history of Wisconsin; ch. 74, Laws of 1856, making appropriations to societies organized to encourage and promote agriculture, domestic manufactures, and mechanic arts; ch. 53, Laws of 1858, providing for the incorporation of agricultural societies and making an annual appropriation to each such society; ch. 214, Laws of 1861, appropriating a sum of money to publish a report of the State Agricultural Society; chs. 84, 97, 104, 105, 179, 210, 301, 381, Laws of 1862, making appropriations to various county agricultural societies in the state. Following this early and continued practice, ch. 181, Laws of 1937, continuing sec. 20.61, Stats., makes annual appropriations to Wisconsin Agricultural Experiment Association, State Horticultural Society, Potato Growers' Association, Wisconsin Cheesemakers' Association, Wisconsin Cheesemakers, Buttermakers, and Dairymen's Advancement Associations,

Wisconsin Horse Breeders' Associations, counties and agricultural societies, associations, or boards, and to incorporated dairy or livestock associations. Ch. 181, Laws of 1937, continuing sec. 20.15, Stats., makes an annual appropriation to custodian of Memorial Hall, Wisconsin Department of Grand Army of Republic, Wisconsin Department of Spanish War Veterans Associations, Wisconsin Department of Association known as Veterans of Foreign Wars, Wisconsin Department of Disabled American Veterans of World War. Ch. 181, Laws of 1937, continuing sec. 20.16, Stats., also makes an appropriation to the State Historical Society.

It is also well established by decisions of the United States supreme court that the fact that an expenditure of public funds benefits certain individuals or one class more immediately than it does other individuals or another class does not necessarily deprive the expenditure of its public character. *Green v. Frazier,* 253 U. S. 233, 40 Sup. Ct. 499, 64 L. Ed. 878; *Nobel State Bank v. Haskell,* 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. 112; *Fallbrook Irrigation Dist. v. Bradley,* 164 U. S. 112, 122, 17 Sup. Ct. 56, 41 L. Ed. 369; *Clark v. Nash,* 198 U. S. 361, 25 Sup. Ct. 676, 49 L. Ed. 1085; *O'Neill v. Leamer,* 239 U. S. 244, 36 Sup. Ct. 54, 60 L. Ed. 249; *Houck v. Little River Drainage Dist.* 239 U. S. 254, 36 Sup. Ct. 58, 60 L. Ed. 266; *Mountain Timber Co. v. Washington,* 243 U. S. 219, 37 Sup. Ct. 260, 61 L. Ed. 685; *Rindge Co. v. Los Angeles County,* 262 U. S. 700, 43 Sup. Ct. 689, 67 L. Ed. 1186; *Great Atlantic & Pacific Tea Co. v. Grosjean,* 301 U. S. 412, 57 Sup. Ct. 772, 81 L. Ed. 1193. Thus, in *Carmichael v. Southern Coal & Coke Co.* 301 U. S. 495, 514, 57 Sup. Ct. 868, 81 L. Ed. 1245, the United States supreme court said:

"This court has long and consistently recognized that the public purposes of a state, for which it may raise funds by

taxation, embrace expenditures for its general welfare. [Citations.] The existence of *local conditions* which, because of their nature and extent, are of concern to the public as a whole, *the modes of advancing the public interest* by correcting them or avoiding their consequences, *are peculiarly within the knowledge of the legislature,* and to it, and not to the courts, is committed the duty and responsibility of making choice of the possible methods. [Citations.] As with expenditures for the general welfare of the United States [Citations], *whether the present expenditure serves a public purpose is a practical question addressed to the lawmaking department, and it would require a plain case of departure from every public purpose which could reasonably be conceived to justify the intervention of a court.* [Citations.]"

To avoid possible confusion, it may be well at this point to direct attention to a distinction between the terms "public use" and "public purpose," for the reason that it has been held that a public use which justifies exercise of the power of eminent domain does not necessarily constitute a public purpose which justifies exercise of the power to tax. This is illustrated by the case of *Whiting v. Sheboygan & Fond du Lac R. Co.* 25 Wis. 167, in which this court held that the fact that the power of eminent domain is conferred upon railroad corporations does not justify the raising of money by taxation to make a donation to a railroad company.

The factors that are to be considered in ascertaining whether an appropriation is for a public purpose are well stated by the United States supreme court in *Citizens' Savings & Loan Asso. v. Topeka,* 20 Wall. 655, 664, 22 L. Ed. 455:

"It is undoubtedly the duty of the legislature which imposes or authorizes municipalities to impose a tax to see that it is not to be used for purposes of private interest instead of a public use, and the courts can only be justified in interposing when a violation of this principle is clear and the reason

for interference cogent. And in deciding whether, in the given case, the object for which the taxes are assessed falls upon the one side or the other of this line, they must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to the public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation."

The course or usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, and the objects and purposes which have been considered necessary for the support and proper use of the government are all material considerations as well as the rule that to sustain a public purpose the advantage to the public must be direct and not merely indirect or remote. In view of this, it may be useful to note some of the purposes which have been held to fall on one side or the other of the line.

The state may make provision for the care and education of children as wards of the state, *Wisconsin Industrial School for Girls v. Clark County, supra;* pay bounties to volunteers in the military service of the country, *Brodhead v. Milwaukee, supra;* pay cash bonuses to those who served in the World War, *State ex rel. Atwood v. Johnson,* 170 Wis. 218, 175 N. W. 589; give educational assistance to veterans of the World War, *State ex rel. Atwood v. Johnson,* 170 Wis. 251, 176 N. W. 224; provide old-age and unemployment aids, *Steward Machine Co. v. Davis,* 301 U. S. 548, 57 Sup. Ct. 883, 81 L. Ed. 1279; *Carmichael v. Southern Coal & Coke Co., supra; Helvering v. Davis,* 301 U. S. 619, 672, 57 Sup. Ct. 904, 81 L. Ed. 1307; provide special aid to

farmers in situations where many farmers and their families might otherwise suffer in health or die from want of food, *Cobb v. Parnell,* 183 Ark. 429, 36 S. W. (2d) 388; give aid to the sufferers of a tornado where necessary to avoid a public calamity affecting the whole state, *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 88 N. W. 596, 90 N. W. 1067. The supreme court of the state of Washington in *State ex rel. Board of Reclamation v. Clawson,* 110 Wash. 525, 188 Pac. 538, sustained an act creating a state reclamation board with authority to purchase farm lands for resale upon convenient terms to soldiers, sailors, and industrial workers who desired to settle on farms. In *Laughlin v. City of Portland,* 111 Me. 486, 491, 499, 90 Atl. 318, 320, the court upheld the establishment of a municipal wood, coal, and fuel yard for sale to the inhabitants of a city at cost as being for a public purpose.

On the other hand, statutes offering bounties for the manufacture of sugar were held to be private in purpose. *Oxnard Beet Sugar Co. v. State,* 73 Neb. 57, 102 N. W. 80, 105 N. W. 716; *Michigan Sugar Co. v. Auditor General,* 124 Mich. 674, 83 N. W. 625; *Minnesota Sugar Co. v. Iverson,* 91 Minn. 30, 97 N. W. 454; *Dodge v. Mission Tp.* (8th Cir.) 107 Fed. 827. The same conclusion was reached with reference to laws and ordinances conferring special benefits upon shoe factories and other manufacturing corporations. *Wendlandt v. Hartford Accident & Indemnity Co.* 222 Wis. 204, 268 N. W. 230; *Cole v. La Grange,* 113 U. S. 1, 5 Sup. Ct. 416, 28 L. Ed. 896; *Parkersburg v. Brown,* 106 U. S. 487, 1 Sup. Ct. 442, 27 L. Ed. 238; *Citizens' Savings & Loan Asso. v. Topeka, supra; Suring v. Suring State Bank,* 189 Wis. 400, 207 N. W. 944. The same ruling was made with respect to federal loans to livestock raisers. *In re Opinion of the Judges,* 59 S. D. 469, 240 N. W. 600. A

statute authorizing taxation to administer the Keeley cure to habitual drunkards who are unable to pay for treatment was held not to be for a public purpose. *Wisconsin Keeley Institute Co. v. Milwaukee County*, 95 Wis. 153, 70 N. W. 68; *State ex rel. Garrett v. Froehlich*, 118 Wis. 129, 94 N. W. 50. A statute authorizing a town to levy a tax to aid in the erection of a private educational institution was likewise held invalid because private in purpose. *Curtis v. Whipple*, 24 Wis. 350.

These cases give no comfort to one who seeks a rule of thumb that will easily dispose of all questions in this field. The rule that the benefits to the public must be direct and not remote and that the past course or usage of government is to be resorted to for guidance must in each case be considered in the light of the principle that the legislature has a very wide discretion to determine what constitutes a public purpose, and that courts will not interfere unless at first blush the act appears to be so obviously designed in all its principal parts to benefit private persons and so indirectly or remotely to affect the public interest that it constitutes the taking of property of the taxpayers for private use. It is to be observed that the tendency of later cases is toward greater liberality in characterizing taxes or appropriations as public in purpose, doubtless in recognition of the fact, as was stated in *Laughlin v. City of Portland, supra,* that:

"Times change. The wants and necessities of the people change. The opportunity to satisfy those wants and necessities by individual efforts may vary. . . . On the one hand, what could not be deemed a public use a century ago, may, because of changed economic and industrial conditions, be such today. . . . Its two tests are: First, the subject matter, or commodity, must be one 'of public necessity, convenience or welfare.' . . . The second test is the difficulty which individuals have in providing it for themselves."

It is necessary at this point to direct attention to a rule equally as important as that requiring that appropriations be

for public purposes. It is the general rule applicable to appropriations that a tax must be spent at the level at which it is raised. Applied to an appropriation by the legislature, this means that the appropriation must not merely be for a public purpose but for a state purpose. Sec. 5, art. VIII, Wis. Const., requires the legislature to provide an annual tax sufficient to defray the estimated expenses of the state for each year, and it has been held in *State ex rel. New Richmond v. Davidson, supra, State ex rel. Owen v. Donald,* 160 Wis. 21, 151 N. W. 331, and *State ex rel. Garrett v. Froehlich, supra,* that an appropriation by the legislature must not merely be public in purpose but a proper expenditure by the state.

With the foregoing in mind, we may now give attention to the specific provisions of the act. For convenience we shall take out of its order sec. 199.03 (5), Stats., which authorizes use of the appropriation to survey the resources and facilities existing in and available for the production, transmission, distribution, and furnishing of light, heat, water, and power in this state and to make surveys and studies for the economical development, use, and conservation of such resources, to the end that there may be an abundance and cheap supply of these services throughout the state; to make studies and surveys for the co-ordination of water-power and fuel-power developments with the regulation of rivers by storage or otherwise for water supply, navigation, flood control, soil conservation, public health, recreational, and other uses. This is obviously a state as well as a public purpose. The scope of the proposed activity is state-wide. So likewise is its effect. The purposes are plainly public. The use of electric energy and other services named has become so essential in the industrial, commercial, agricultural, transportation, and domestic activities of everyday life, and to the economic well-being and general welfare of the people of this state, that it has come into the category of public neces-

sities and the state-wide distribution thereof at the lowest possible reasonable cost can rightly be considered a matter of public concern and clothed with a public interest. Surveys and researches for the purpose of aiding the objective of an abundant and cheap supply of these services throughout the state constitute state-wide expenditures for a clearly public purpose.

It is contended that there is nothing in the act to indicate that this information is to be available to the general public, and that therefore it must be treated as the property of a private corporation to be used for its own benefit. We think this rather narrow view of the section cannot prevail. It is fairly to be inferred that the statistics and data made possible by appropriation of public funds were intended to be the property of the state and available to all the citizens. The ordinary presumption of constitutionality would require this conclusion.

We now come to the portion of the act which offers the greatest difficulty. It is convenient to consider separately sec. 199.03 (1) and (2), Stats., which authorize the use of the funds appropriated to promote or encourage the organization of municipal power districts under ch. 198, Stats., co-operative associations, and nonprofit corporations to engage in the light, heat, and water-power, telephone, street, or interurban-railway, or bus businesses, and sec. 199.03 (3) and (4), which authorize use of the funds to promote the acquisition, ownership, construction, operation, or management of any plant or part thereof for the production, transmission of light, heat, or power by any of the co-operative associations, nonprofit corporations, cities, villages, municipal power districts, etc., or any group or combination thereof. We do this because of what seems to us a radical difference between the two groups. The first group consisting of subs. (1) and (2) merely authorizes use of the funds

to promote and encourage generally the organization of municipal power districts and co-operatives. As hereafter construed, it has nothing to do with promoting the organization of any particular municipal power district or co-operative. In group 2, consisting of subs. (3) and (4), the activities are particularized. The Wisconsin Development Authority is authorized to promote and encourage the acquisition, ownership, construction, operation, or management of *any* plant or *any* part thereof by *any* co-operative association, city, village, town, power district, etc. We are unable to ascribe to these subsections any purpose to invest the corporation with general educational activities of the sort which are sustainable. We cannot avoid the conclusion that these subsections warrant use of the money appropriated to agitate for and actually assist the acquisition, construction, etc., of particular plants by particular organizations. It is apparent to us that this purpose cannot be sustained. We pass the question whether it is a public purpose. Certainly the acquisition of a plant by a municipality is a public purpose viewed from the standpoint of a particular municipality, and if the state may authorize the acquisition of plants by municipalities, its encouragement of such acquisition by general educational means might at least be argued to constitute a public purpose. But it is obvious that the second group of subsections authorizes the Wisconsin Development Authority to urge and assist a particular group or municipality to construct or acquire a particular plant, and that this is a private, local, and proprietary matter with which the state has no concern. The appropriation is not for a state purpose within the rule of the *Froelich* and *New Richmond Cases*. An appropriation cannot be sustained to enable the Wisconsin Development Authority to go into a municipality and to promote, encourage, or agitate for the construction of a plant or the acquisition of an existing plant by that municipality

or by any group of citizens therein, however organized. To appropriate funds to be so used is to devote the funds of the taxpayers generally to the promotion of a matter that is not of state concern. This is particularly true with reference to municipal ownership because that question is determined universally by a referendum. If the state may agitate and promote municipal ownership in a particular community, it may also influence the electorate to pass favorably upon the question of acquisition. For the state to throw the weight of the taxpayers' money into the scales upon an election to determine a purely local and proprietary question cannot upon any theory or principle be considered an appropriation for a state purpose. That it may be unconstitutional upon other and more general grounds is also arguable, but there is no need to determine this question here.

This conclusion is further fortified with reference to municipal ownership by the general policy of the home-rule amendment (sec. 3, art. XI, Wis. Const.), which has committed matters of local concern to particular municipalities and put these beyond the power of the legislature to interfere with. What is said about municipalities and municipal ownership applies to co-operatives seeking to enter the utility field and to furnish for members facilities commonly provided by privately owned utilities. The appropriation by the state of money to encourage particular co-operatives to acquire particular existing plants or to construct them cannot be sustained because the use of state money to aid in matters that are private and local is not a state purpose. What is said with respect to co-operatives is equally applicable to municipal power districts and other corporations mentioned in these subsections. The practice in the past of giving aids to local communities for the promotion of education and public health does not create a usage of government that supports the state purpose of the subsections in the second group for the reason that in these cases the state is dealing with matters

concededly affecting the whole state and being properly state functions, namely, health and education. The principle underlying such appropriations is well stated in the *New Richmond Case, supra,* and no further exposition is necessary here.

For purposes of illustration the purposes set forth in the second group of subsections may profitably be compared with those set forth in sec. 178.03, Stats. (created by ch. 4, Laws of Sp. Sess. 1937), with reference to the Wisconsin Agricultural Authority. There, the purposes are in brief to promote high standards for agricultural production; to assist in expanding markets and developing new markets for agricultural products; to promote improved methods of manufacturing, advertising, etc.; to collect and disseminate information and engage in technical studies in furtherance of these functions; and finally, to co-operate and assist persons, firms, co-operative associations, groups, and other organizations, cities, towns, and villages, and governmental units in the execution of its duties. These functions are all to be exercised for the promotion of the general agricultural prosperity of the state. They are state-wide in scope and in no instance do they constitute an activity on behalf of a purely local or proprietary interest at the expense of the state. The methods by which the agricultural authority functions are largely by making available to all who make calls upon it the results of its researches for the general purposes of agricultural advancement in the state at large. In other words, there is not in the Wisconsin Agricultural Authority Act any such particularized activity of a purely private, local, or proprietary character as would constitute a diversion of taxpayers' money for a purpose not authorized either because not public or not state-wide in character.

With respect to the first group, consisting of subs. (1) and (2), which permits use of the money to promote and encourage the organization and creation of power districts,

the question is whether, in view of the construction which must be given to group 2, it is possible to treat this group as merely authorizing use of the money for promotion and encouragement of a purely educational character, state-wide in scope and available to all citizens for the purpose of making generally available upon an economical basis the services mentioned in these subsections. Encouragement of these projects by the dissemination of information with respect to their character, the manner in which they may be organized, the advantages to be derived from them, and the benefits which may come to the state at large, all fall within the educational field and constitute a public purpose and a proper state activity. The encouragement of co-operative action is by no means new in this state. Sec. 93.07, Stats., provides:

"It shall be the duty of the department: . . .
"(17) (a) To promote the efficient marketing of the dairy and farm products of Wisconsin, through co-operative marketing associations now in operation or which may be organized hereafter."

Counties are authorized to establish and maintain an agricultural representative. Sec. 59.87 (2) (d), Stats., provides that such agricultural representative shall:

"Aid in the formation of co-operative enterprises."

Sec. 94.15, Stats., declares:

"The history of the farm marketing problem in the state and nation, as well as throughout the world, points to a solution chiefly through co-operative marketing efforts of producers. It is, hence, declared to be the policy of this state, in advancing the general good and the public welfare, to assist in the organization and development of co-operative associations for production and marketing purposes along lines of dairy and other farm products."

While these particular provisions have not been tested as to their constitutionality, this court has definitely held that

agriculture co-operatives are favored in the law and impliedly held that such favor as has been shown co-operatives by the legislature is not invalid as being private in purpose or discriminatory in operation. *Northern Wis. Co-operative Tobacco Pool v. Bekkedal,* 182 Wis. 571, 197 N. W. 936; *State ex rel. Saylesville C. Mfg. Co. v. Zimmerman,* 220 Wis. 682, 265 N. W. 856. Bearing in mind that one of the highly important circumstances in ascertaining the public character of an appropriation is the course and usage of government, we think the course of legislative action in connection with agricultural co-operatives is entitled to great weight as indicative that it has been the course and usage of government in this state to consider as public in character and state-wide in scope the encouragement of co-operative enterprises, and we are unable to resist the conclusion that, provided the activity be general and educational in character, the state may encourage co-operative activity in the utility field. It also appears to us that with the same limitations, it may encourage the grouping of utilities in power districts for purposes of economical production. If the state may authorize municipalities to acquire and operate utilities and to pay for their acquisition or maintenance by taxation, it is difficult to condemn as private in purpose the encouragement of co-operatives and power districts generally. The question is whether the subsections in group 1 will bear the construction that must be put upon them if a public and state purpose is to be sustained. As heretofore noted, the subsections constituting group 2 fail in public purpose because the subject matter indicates that they deal with the promotion of particular local projects with which the state has no concern. The subject matter of the subsections in group 1 does not support the same conclusion. The word "promote" is the same as that used in sec. 93.07 (17) (a) relative to co-operative marketing associations in the field of agriculture.

While perhaps this word is ordinarily taken in a broader sense, we think it proper to use the term in the more restricted sense of advancing by general educational means such action as is sought to be promoted. The word "encourage" gives very little trouble as it has no technical meaning and may be considered to refer to the activity of advancing or promoting by educational means proper for the state to engage in. We see no great difficulty in construing the words "promote" and "encourage" to authorize the corporation to engage in such educational activities as are ordinarily proper for the state to engage in and to use the funds for this purpose. This court is bound to give to an act a construction that will avoid constitutional objections to its validity if it will bear it. *Peterson v. Widule,* 157 Wis. 641, 147 N. W. 966; *Palms v. Shawano County,* 61 Wis. 211, 21 N. W. 77; *State ex rel. Chandler v. Main,* 16 Wis. \*398; *Atkins v. Fraker,* 32 Wis. 510; *Attorney General v. Eau Claire,* 37 Wis. 400; *State v. Eau Claire,* 40 Wis. 533; *Bound v. Wisconsin Central R. Co.* 45 Wis. 543. This rule applies even though the construction which leads in this direction is not the most obvious or natural construction of the act. *Johnson v. Milwaukee,* 88 Wis. 383, 60 N. W. 270. Without putting any great strain upon this rule, we conclude that subs. (1) and (2) may be construed as indicated, and that, as so construed, they may be sustained as setting forth proper public and state purposes.

Sec. 199.02, Stats., fortifies this construction. It provides that the corporation—

"shall not use or expend any of the funds appropriated to it by the state for any activities or functions which would be repugnant to the constitution of the state if carried on by the state. . . ."

Thus, as to any subsection which will bear the restricted meaning necessary to sustain its constitutionality, we think

the act contains interior evidence of a purpose so to restrain the language. As so construed it would, of course, be beside this purpose and an unauthorized use of the appropriation for the corporation to send an agent into a particular community to organize or agitate for the organization of a particular co-operative or power district. The question whether a particular co-operative or power district shall be formed is a matter of private and local concern, just as is the question whether a particular municipality shall own its utility plant. There is nothing in any given local situation that warrants the state in taxing citizens generally to advance the proprietary interest of that community or any group in it.

One of the principal contentions upon which the defendant relies in questioning the constitutionality of ch. 334, Laws of 1937, is that the use of the state funds appropriated by that act for the execution of the duties and functions prescribed in subs. (1) to (7) of sec. 199.03, Stats., would constitute a violation of the provision in sec. 10, art. VIII, Wis. Const., that,—

"The state shall never contract any debt for works of internal improvement, or be a party in carrying on such works; . . ."

That contention cannot be sustained. Performance by the Wisconsin Development Authority of the prescribed duties and functions by merely promoting or encouraging the organization or creation of municipal power districts, co-operative associations, or nonprofit corporations, and the mere making of the surveys and studies, engaging in the research, planning, and educational activities, and acting in co-operation with the federal government and its agencies when necessary in the execution of the prescribed duties and functions, would not in and of itself create any such physical structures or conditions as would constitute "works of internal improvement" within the meaning of that term as used

in sec. 10, art. VIII, Wis. Const. At most, such perform-
ance would but constitute or facilitate the promotion and en-
couragement of works of internal improvement by munici-
palities, municipal power districts, or the other political or
governmental units, or by such associations or corporations
as are described in the act. But such mere promotion and
encouragement of the making of such improvements by
others is not prohibited by any of the terms in sec. 10, art.
VIII, Wis. Const. In the proposed constitution which was
drafted by the first constitutional convention, but rejected by
the electorate largely because of objections to other provi-
sions, the provision as to activities by the state in relation to
works of internal improvement reads:

"This state shall encourage internal improvements by
individuals, associations and corporations, but shall not
carry on or be a party in carrying on, any work of internal
improvement, except in cases authorized by the second sec-
tion of this article."

The inclusion in that provision of the clause "this state
shall encourage internal improvements by individuals, asso-
ciations and corporations" not only indicates that the con-
vention had the matter of the state encouraging the making
of internal improvements by others in mind to such an ex-
tent that the provision expressly directed the state to encour-
age such works, but also discloses that that direction was not
considered in conflict or inconsistent with the express provi-
sion embodied in the constitution then proposed, and also in
the constitution finally adopted which prohibits the state
from carrying on or being a party in carrying on any works
of internal improvement. On the contrary, the fact that,
in the very section in which that prohibition was embodied
in the constitution first proposed, the state was expressly
directed to encourage the making of such improvements by
others, demonstrates convincingly that there was deemed to

be and is such a material distinction between those two activities that the mere encouragement of others to engage in such works was not considered to constitute the carrying on, or being a party in the carrying on, of such work. It obviously would have been impossible for the state to comply with the direction to encourage such improvements by others if by the terms "carry on" or "be a party in carrying on" it was intended to also forbid the encouragement of others to make such improvements. If, when those provisions were drafted, there was not deemed to be any inconsistency or conflict in directing the state to engage in one and in prohibiting it from engaging in the other of those activities, then there is likewise no occasion now to hold that it was intended by sec. 10, art. VIII, Wis. Const., to prohibit encouragement by the state of the making of such improvements by others. And that such encouragement is not prohibited by that section was held in *Jensen v. Board of Supervisors of Polk County,* 47 Wis. 298, 2 N. W. 543; *State ex rel. New Richmond v. Davidson, supra;* and *Appeal of Van Dyke,* 217 Wis. 528, 545, 259 N. W. 700, by sustaining legislative enactments by which the state promoted or encouraged the making of such improvements, even though such encouragement in the two cases last cited was by appropriations of state funds. See also *State ex rel. Hopkins v. Raub,* 106 Kan. 196, 186 Pac. 989, in which it was held that the promotion and encouragement by the state of the construction of highways by political subdivisions thereof by an appropriation of state funds to pay for activities, which consisted of educational, advisory, regulatory, and co-ordination activities relating to such construction, were not prohibited by the provision in the constitution of Kansas, which is similar to sec. 10, art. VIII, Wis. Const.

We conclude, (1) that the purposes defined in sec. 199.03 (3) and (4), Stats., are not state purposes and that no part

of the appropriation may be devoted to them; (2) that sec. 199.03 (1) and (2) are public and state purposes, and that they are to be construed to authorize encouragement of co-operatives and power districts by general educational activities of the sort permitted in the case of agricultural co-operatives, but not to authorize agitation for or organizational activities directed to the creation of any particular power district or co-operative; (3) that sec. 199.03 (5), which authorizes survey of the resources, is a valid public and state purpose; and (4) that sec. 199.03 (6), which authorizes the use of the appropriation to collect and disseminate information and engage in research, planning, and educational activities necessary to carry out its functions, is properly ancillary to sec. 199.03 (1) and (2), and constitutes an appropriation for a public and state purpose.

It is contended that by reason of the fact that it is a special act granting the Wisconsin Development Authority the privileges, (1) of access to records of the public service commission; (2) of commanding the public service commission to obtain further information; (3) of having the governor command any officer, agent, or employee of the state to give assistance or advice; and (4) of having the secretary of state audit certain of its accounts, the act violates sec. 31, art. IV, Wis. Const., reading:

"The legislature is prohibited from enacting any special or private laws in the following cases: . . . 7th. For granting corporate powers or privileges, except to cities."

The contention is without merit. Appellant relies upon *Stevens Point Boom Co. v. Reilly,* 44 Wis. 295, in which a special act was held to violate sec. 31, art. IV, Wis. Const., because it gave to an existing corporation the power to construct booms across the river and to improve navigation. However, that case was overruled in *In re Southern Wisconsin Power Co,* 140 Wis. 245, 122 N. W. 801. It was

held in the latter case and also in *Calumet Service Co. v. Chilton,* 148 Wis. 334, 135 N. W. 131, that it is only a privilege inhering in the corporate charter as part of the corporation's organic act that is within the provision in sec. 31, art. IV, Wis. Const., prohibiting the granting of corporate powers or privileges by special act. In *In re Southern Wisconsin Power Company, supra,* the court said, with reference to a franchise to construct a dam (p. 257):

"While the franchise here granted was a legislative grant, it was not a corporate power or privilege within the meaning of sec. 31, art. IV, of the constitution. If such a franchise were granted to a corporation it would become its property, but would not be essential to its corporate existence. The clause prohibiting the granting of corporate powers or privileges simply prohibits the grant of corporate charters by special act. A franchise is not essentially corporate, and it is not the grant of a franchise that is prohibited by the constitution, but the grant of a corporate franchise."

It follows that if in any of the above respects any power whatever was vested in the Wisconsin Development Authority the power was not a corporate power in the sense referred to in the constitutional provision.

It is next contended that the act is invalid because it delegates judicial powers to the secretary of state. This contention is based on the provision in sec. 199.02, Stats., that no part of the appropriated funds shall be used by the corporation for activities repugnant to the constitution if carried on by the state and the requirement in sec. 199.05, Stats., that all disbursements of these funds to the corporation shall be audited by the secretary of state in the manner provided by law. Although as contended the secretary of state acts in but a ministerial capacity in performing most of his duties, *West Park Realty Co. v. Porth,* 192 Wis. 307, 212 N. W. 651, his acts must necessarily be somewhat judicial in character in order to perform the constitutional duty imposed by

the provisions of sec. 2, art. VI, Wis. Const., that he act as *"ex officio* auditor." This court said in *State v. Hastings,* 10 Wis. *525, *533, in speaking of the secretary's duties as *ex officio* auditor :

"In one sense, the entire moneys of the state are under his control. None can be paid out, no disbursements made, without his sanction. All claims and demands against the state must be submitted to his decision. In many respects, his acts are judicial in their nature, and depend upon the exercise of a sound judgment."

The requirement in sec. 199.05, Stats., that the secretary of state audit the disbursements of the corporation is a mere restatement of the duty imposed upon him by the constitution itself. It is, therefore, not unconstitutional for the reason claimed. Whatever power of a judicial character is involved in the audit has its source in the constitution itself.

It is next contended that the act loans the credit of the state in violation of sec. 3, art. VIII, Wis. Const., which reads :

"The credit of the state shall never be given, or loaned, in aid of any individual, association or corporation."

It is argued that the giving or loaning of credit does not necessarily mean the creation of an indebtedness, but includes the holding out of an expectation that payment will be forthcoming and belief or faith that the state will make the disbursement. From this defendant concludes that if plaintiff prevails, it follows that the state has not only loaned its credit but created a legally enforceable indebtedness in violation of sec. 4, art. VIII, Wis. Const. This contention is made in spite of the provision in sec. 199.02, Stats., that the "state shall never be liable . . . for any debt or obligation of Wisconsin Development Authority." In support of the contention defendant cites *State ex rel. Atwood v. Johnson,* 170 Wis. 251, 176 N. W. 224, and *Appeal of Van Dyke, supra.* The first of these cases is not in point because the statements

therein are limited to the proposition that the soldiers' bonus law was a voluntary gift, revocable at will, and therefore did not create a debt or constitute a lending of the state's credit. In the *Van Dyke Case* the court had under consideration sec. 4, ch. 29, Laws of Sp. Sess. 1931–32, which provided for an emergency surtax on incomes for relief purposes. It was contended that the beneficiaries of the law could obtain credit on anticipated funds to be received pursuant to the appropriation, and that therefore the credit of the state was given or loaned in their aid. Disposing of that contention, the court said:

"Nor does the argument that ch. 29 violates sec. 3, art. VIII, Wisconsin constitution, which provides that 'the credit of the state shall never be given, or loaned in aid of any individual, association or corporation,' appeal to us."

It is our conclusion that the giving or loaning of the credit of the state which it was intended to prohibit by sec. 3, art. VIII, Wis. Const., occurs only when such giving or loaning results in the creation by the state of a legally enforceable obligation on its part to pay to one party an obligation incurred or to be incurred in favor of that party by another party. There is no such giving or loaning of the state's credit within the meaning of that prohibitory provision when all that is done by the state is to incur liability directly or only to such other party as, for example, where the state lawfully employs someone to perform an authorized service for the state.

It is next contended that because Charles B. Perry and John A. Anderson were members of the 1937 legislature when the act was passed and were also members of the Wisconsin Development Authority the act violates that portion of sec. 26, art. IV, Wis. Const., which reads:

"Nor shall the compensation of any public officer be increased or diminished during his term of office."

That provision is not applicable for two reasons: (1) There is no provision in the act to pay any compensation to members or officers of the Wisconsin Development Authority; and (2) there is no showing that either Mr. Perry or Mr. Anderson received or are to receive compensation from the Wisconsin Development Authority, or that if they do it would be out of the appropriated state funds or by virtue of the act. It goes without saying that if either received compensation for services performed in his private capacity for the corporation, it would not be part of or an increase in his compensation from the state for his services as a public officer.

It remains to be considered whether the fact that the appropriation is held void as to two of the declared purposes has rendered the provisions of the act invalid to such an extent that there remain none by which the legislative intent and purpose thereunder can be accomplished.

Sec. 199.07, Stats., provides:

"If any provision, sentence, clause or word of this chapter or the application thereof to any person or circumstance shall be held invalid, the remainder of this chapter and the application of such provision, sentence, clause or word to other persons or circumstances shall not be affected thereby."

This clause is very broad and is entitled to great weight as an indication of legislative intent in determining whether the unobjectionable portions of the act can stand. The clause, of course, is not conclusive, and if so little of the act remains as not to leave a "living, complete law capable of being carried into effect 'consistent with the intention of the legislature which enacted it in connection with the void part' " it is the duty of the court to decline to sustain the act in part in spite of a separability clause. *State ex rel. Reynolds v. Sande,* 205 Wis. 495, 503, 238 N. W. 504, 507; *Borgnis v. Falk Co.* 147 Wis. 327, 133 N. W. 209; *Water Power Cases,*

148 Wis. 124, 134 N. W. 330. Here, however, the portions of the act held to be proper and valid constitute a substantial part thereof, and the Wisconsin Development Authority retains four important purposes for which the money appropriated may properly be spent. If the part of an act remaining independently of the invalid portion constitutes a complete law in some reasonable aspect, it will be sustained in part unless the legislature has indicated that it only intended it to be effective as an entirety. *State ex rel. Wisconsin Tel. Co. v. Henry,* 218 Wis. 302, 260 N. W. 486; *Weco Products Co. v. Reed Drug Co.* 225 Wis. 474, 274 N. W. 426; *State ex rel. Reynolds v. Sande,* 205 Wis. 495, 238 N. W. 504; *State ex rel. Buell v. Frear,* 146 Wis. 291, 131 N. W. 832; *Income Tax Cases,* 148 Wis. 456, 134 N. W. 673, 135 N. W. 164; *Brittingham & Hixon L. Co. v. Sparta,* 157 Wis. 345, 147 N. W. 635.

It now becomes necessary to apply to the facts of each case involved upon this appeal the foregoing principles. For convenience, the cases will be referred to as the *Murray, Maloney,* and *Tuttle Cases.* The *Murray Case* is an action to compel the secretary of state to order payment of $60 for services rendered by V. M. Murray in making a survey of the resources and facilities of the state for the production, transmission, and furnishing of light, heat, and power in the state. The particular services rendered consisted of certain preliminary estimates to determine what material was available, and to prescribe an outline of procedure to be followed in the making of surveys in the correlation of the material in the various libraries useful in the carrying out of the project. We see no reason why this claim should not be audited. The activities there constitute an execution of the purpose defined in sec. 199.03 (5), Stats.

The *Maloney Case* involved services rendered by Norris E. Maloney in connection with a contract of employment to

promote the organization of a co-operative association in the county of Crawford. As part of his duties he was to contact and confer with such individuals or groups as were deemed to be fairly representative of the townships within the county, and to advise these individuals or groups of the requirements advisable for consideration in the organization of a co-operative association, and so to promote the organization, collect, and disseminate such information, and engage in such educational activities as he might deem advisable to make available information relative to the benefits to be derived from the organization of a co-operative association. In the performance of his duties he conferred with some thirty-four individuals. The amount charged for such services was $40. The account for this activity should not be audited. The people of the state at large have no interest in the question whether a co-operative organization is organized in Crawford county. That is a local and not a state problem, and the money of the state may not be devoted to its solution.

The *Tuttle Case* deals with the claim of H. I. Tuttle, Inc., for multigraphing five hundred eighty-five copies of a form letter to be sent by the Wisconsin Development Authority to the chief executive officers of the various municipalities of the state. This letter recites the purposes and functions of the Wisconsin Development Authority, and advises that the Wisconsin Development Authority is anxious to be of assistance to municipalities in the acquisition, ownership, etc., of plants and facilities, and offers to give advice and information with respect to such activities, make investigations and studies, and

"In general perform promotional services which may be helpful in connection with these activities. If your municipality is contemplating or interested in acquisition proceedings, for instance, Wisconsin Development Authority will be available to investigate the economic feasibility thereof, ad-

vise you as to general procedure, and furnish you with such data, facts, and figures as you may need. . . .

"If your municipality desires us to have one of our representatives call on you to discuss these matters in greater detail, kindly advise us so that we may arrange for a conference."

This letter is unobjectionable in so far as it merely brings to the attention of persons who may be interested the services that the Wisconsin Development Authority may legitimately perform. In so far as it offers to perform promotional services in the particular community addressed or to investigate and determine the economic feasibility of municipal ownership in particular municipalities, the letter, of course, is offering services which the Wisconsin Development Authority is not in a position to give in accordance with this opinion. It is our view that the fact that the Wisconsin Development Authority in a particular letter may somewhat overstate the services that it is in a position to perform is not enough to make the expenditure improper, provided the letter does bring to the attention of the persons to whom it is addressed functions of the Wisconsin Development Authority that may properly be discharged. After all, this is a mere detail, a mere exercise of the right of the Wisconsin Development Authority to bring its services to those whom it would serve, and we think that it would be a harsh doctrine that would make the discharge of this perfectly proper function depend upon whether the Wisconsin Development Authority had stated with complete correctness the services that it was in a position to discharge. It is our conclusion, therefore, that this account should be audited and paid.

*By the Court.*—The former mandates in these cases are vacated and set aside. The orders in the *Murray* and *Tuttle Cases* are affirmed. That in the *Maloney Case* is reversed,

the peremptory writ vacated, and 'the cause remanded with directions to quash the alternative writ.

FRITZ, J. (*concurring*). I concur in the opinion written by Mr. Justice WICKHEM, except in so far as it is stated, in effect, 'that the Wisconsin Development Authority was empowered by its articles of organization to do everything that it could do after the enactment of ch. 334, Laws of 1937, and that, when its pre-existing corporate powers are considered in relation to that enactment, it must be held to constitute a mere appropriation measure, which does not confer any power at all except to spend the appropriation for the purposes defined in the act. In my opinion the articles of organization and purposes authorized thereby are immaterial in determining whether the act confers governmental power, or whether it is but an appropriation measure. If it does purport to confer such power, the fact that the corporation's articles purport to confer like power is of no consequence in passing upon the validity of the act. Even though corporate articles may specify as a corporate purpose the exercise of certain duties and functions as a state instrumentality and the receipt of state funds therefor, that would not constitute the corporation an instrumentality of the state and empower it as such to exercise such duties and functions at the state's expense, in the absence of a statute constituting it such an instrumentality and empowering it to act in that capacity.

Furthermore, the provisions in sec. 199.04 of the act were obviously intended to confer some power and rights which the Wisconsin Development Authority would not have in the absence of such provisions, and which it could not have by virtue of but its articles of organization. No other private corporation or unofficial state instrumentality has been given any such right of access to all available information collected by any department of the state, or been empowered to require

the public service commission to obtain and gather even further information for it. The vesting of that power in the Wisconsin Development Authority virtually subordinates the official public service commission to the commands of but a private corporation. It may be within the province of the legislature to authorize private parties to have such access, or call for such information; and provisions to merely that effect may not indicate the intention to confer governmental power. But the provisions in sec. 199.04 can be deemed to have some bearing upon that proposition when, in connection with the powers vested thereby in the Wisconsin Development Authority, there are considered the various duties and functions which it was to execute as a state instrumentality under all of the provisions enacted as part of ch. 334, Laws of 1937, and the consequent necessity for its exercise of considerable discretion and responsibility in the proper performance thereof.

However, the discretion and responsibility in those respects, and the consequences thereof mentioned in the original opinion herein, have been diminished to such an extent by holding that an important group of purposes under the act do not constitute proper state purposes (as is stated in the opinion by Mr. Justice WICKHEM), that what now remains to be performed by the Wisconsin Development Authority does not constitute the exercise of governmental power. Consequently I concur in the conclusion that the portions of the act which remain upon the elimination, under the separability clause, of the invalid provisions must be sustained.

FOWLER, J. (*dissenting*). I agree with the view expressed in the opinion of the court on rehearing to the effect that if a corporation is engaged in doing something which it is the duty of the state to do, or which the state has power under the constitution to do, the state may appropriate to that cor-

poration funds to aid it in doing that particular thing, except that it may not appropriate funds to a corporation that is operating a school. *Wisconsin Industrial School for Girls v. Clark County,* 103 Wis. 651, 79 N. W. 422, settles the main proposition. *Curtis v. Whipple,* 24 Wis. 350, settles the exception. , The main proposition doubtless supports the appropriations to the several corporations and associations which have appeared herein upon rehearing as *amici curiæ.*

I also agree with such opinion of the court that it is not a state-wide public purpose to encourage or promote the construction or taking over of any particular public utility by a co-operative or nonprofit association or a municipal corporation or power district, and that subs. (3) and (4) of sec. 199.03, Stats., which purport to empower the Wisconsin Development Authority to use public funds in promotion of such projects, are unconstitutional.

I also agree that the payment of the instant bill of Norris E. Maloney in efforts to organize a particular co-operative for the construction and operation of a public utility should be enjoined as an unconstitutional expenditure of public funds, and the mandate in his case directing the disallowance of said bill by the secretary of state should be affirmed.

But I am also of opinion that none of the purposes of the act for which the Wisconsin Development Authority by the terms of the act is authorized to act for the state is constitutional, and that public funds cannot be expended in furthering any one of them. If this is correct, the act is unconstitutional as a whole, and the mandate originally entered should stand.

Suggestion is made in several of the briefs that no act of the legislature can be declared unconstitutional unless it is contrary to some express prohibition of the constitution. This is incorrect. That it is incorrect is implied by the concession in all of the briefs in support of the act under consideration that appropriations must be for a public purpose.

There is no provision of the constitution that expressly declares that appropriations shall be for a public purpose. There is no express provision in the constitution prohibiting the legislature from enacting statutes infringing on the in-alienable or inherent rights of individuals, but any act of the legislature so infringing is unconstitutional. This is illustrated by the declarations of this court in relation to the in-herent right of the individual to receive property by will or inheritance or to transfer it by will. The court has declared that these are inherent rights and the legislature cannot take them away. *Black v. State,* 113 Wis. 205, 89 N. W. 522; *Nunnemacher v. State,* 129 Wis. 190, 108 N. W. 627; *Will of Rice,* 150 Wis. 401, 136 N. W. 956, 137 N. W. 778.

It is an inherent right of an individual or of individuals forming an association or corporation to enter into and continue in any business, in itself innocent and of economic value to the public, whether that business be the operation of a utility or any other, on equal terms with everybody else. Thus profit-sharing corporations or associations have an inherent right to form and operate utilities on equal terms with municipalities, nonprofit corporations, and associations and co-operatives. Any legislative act that favors one class of individuals over another, or one class of associations over another, in entering or continuing in a line of business, violates this principle of equality of inherent rights.

The proposition above stated is based on sec. 1, art. I, of the state constitution. It reads:

"All men are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed."

*Black Case,* pp. 219, 226, 89 N. W. 522; *Nunnemacher Case,* pp. 220, 230, 108 N. W. 627; *Rice Case,* p. 445, 136 N. W. 956. The section is a vital part of the constitution. It is as

vital as any other provision securing individual rights. It is of even higher status than any other such provision, for the preamble to the constitution declares that the primary purpose of establishing the constitution was "to secure the blessings of freedom." On this point Mr. Justice DODGE said, speaking for the court in *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 532, 90 N. W. 1098:

"By the preamble, preservation of liberty is given precedence over the establishment of government. It would be inconceivable that the people of Wisconsin, in establishing a government to secure the rights of life, liberty, and the pursuit of happiness, should by general grant of legislative power have intended to confer upon that government authority to wholly subvert those primary rights; and in this view it has been held by this court that legislative acts conflicting with that declared purpose are forbidden by the constitution, and must be denied efficacy by the courts."

The "freedom" of the preamble of the constitution is the "liberty and pursuit of happiness" of sec. 1, art. I, Wis. Const. Of the force of that section Mr. Justice DODGE, in the *Nunnemacher Case,* pp. 230, 231, said:

"This section, while in form merely declaratory of general principles, has been repeatedly held to so evince the conception of private and individual rights of the people of this state which must be sacred against violation by the government which they consented should exist over them, that it declares a limitation upon the powers of that government. . . . In this first utterance of our constitution is declared the keynote and dominating principle of the social organization established by it, namely, equality before the law of every individual. Whatever may be thought at this day by political scientists or theorists as to the ideal government or society, the conception of our forbears was a government not primarily for its own convenience, but for the protection of the individual rights of those who were to live under it. Government was not the end but merely the means to secure individual liberty and happiness."

Just what constitutes deprivation of "liberty and pursuit of happiness" within sec. 1, art. I, Wis. Const., is not easy, probably impossible, to define. Mr. Chief Justice WINSLOW says of it in the *Black Case,* p. 219, that:

"This may be said to be somewhat vague and general,— somewhat in the nature of a rhetorical flourish; but when it is said that all men equally free have the inherent rights of life, liberty, and the pursuit of happiness, it is certain that it is not meant that some have or may have greater privileges before the law than others. The phrase must mean equality before the law, if it means anything."

Mr. Justice MARSHALL says of the "pursuit of happiness" in the *Black Case,* p. 228, that:

"The right to seek happiness implies the right to acquire and enjoy that upon which happiness depends and to enjoy it in a way to promote the most complete human contentment, to satisfy completely the physical needs, and those of the intellect and affection as well; that without such privileges there can be no perfect happiness, therefore the recognition of the right to seek happiness as inherent in all men, implies the right to seek all the essentials of happiness, to satisfy the natural longings of our human nature so far as that is consistent with a perfectly regulated social system."

I take it, from the decisions of this court above cited and countless others to the same effect, that any act of the legislature that appropriates money to further any purpose that operates to deprive one citizen of the right to liberty and to seek happiness on equal terms with every other citizen, or that operates to deny to any class of citizens equality in this respect with every other class of citizens, violates the fundamental provision of the constitution expressed by sec. 1, art. I, Wis. Const., and is thus void. I also take it, that it is upon this fundamental provision that the conceded rule rests that any act of the legislature that appropriates money for any purpose but a public purpose is void. Let us see

whether, and in what respects, if any, the instant statute, sec. 199.03, runs counter to the requirement of public purpose or violates the equality provision of the constitution.

There is no need to discuss sub. (3) or (4). The opinion of the court on rehearing holds them void, as above stated, because it is not a state-wide public purpose to create or take over a public utility for or by any particular municipality or co-operative, and these sections apply only thereto.

The purpose declared by sub. (1) is "to promote or encourage the organization or creation of municipal power districts in the state under ch. 198 [Stats.]." A power district is a corporation. Sec. 198.02. It is declared a municipal corporation, but it is still a corporation, and in respect to operating a utility it stands under the constitution upon precisely the same basis as any other corporation organized for the purpose of operating a utility. In considering whether promoting the organization of such a corporation violates the equality provision of the constitution the powers of power districts may properly be considered. Such corporations may acquire "any utility or portion thereof" within or without the district to be used in connection with the operation of the utility. Sec. 198.12 (6), Stats. It may acquire any existing utility operating in whole or in part within the district or any part thereof. Sec. 198.13 (1), Stats. After a district is created no permit shall be granted to construct or operate any utility therein or to construct any extension or addition of any existing utility, except by the board of the power district. Power districts are given the power of eminent domain to take over other public utilities within the district. Sec. 198.17, Stats. Other public utility corporations are given none of these powers. To expend public funds to aid in the organization of this highly favored class of corporations to engage in operating a utility, while denying such expenditure in aid of the organization of other

corporations to engage in operating the same kind of utility, is denying to the latter equal privileges with the former. We are here not directly concerned with the favoritism involved in giving to power districts powers which other utility corporations do not possess, but to exercise favoritism in granting aid in organizing a class of corporations already highly favored, accentuates and increases the degree of constitutional violation involved in extending the aid. The consequence of the granting of aid in the organization of power districts is to promote the abolishment of privately owned public utilities; to promote the taking over of existing private utilities against the wishes of their owners; to promote the exclusion of persons who may wish to create and operate utilities from the right and opportunity to do so; to encourage the boards of power districts to deny to existing utilities the right to extend their utilities or make additions thereto. To promote or encourage these things is to promote and encourage the deprivation of owners of utilities and of persons who may wish to create and operate them, of the "liberty and pursuit of happiness" the quotation from Mr. Justice MARSHALL's opinion above given states that sec. 1, art. I, of the constitution, secures, and of the equality of opportunity that the quotation from Mr. Justice WINSLOW's opinion states it secures. It is contrary to the primary purpose of the adoption of the constitution, a rejection of a fundamental principle of the constitution. It is a repudiation of sec. 1, art. I, of the constitution. No public purpose can be served by violation of the constitution. Public purpose is served by obedience to the constitution, not by violation of it.

The purpose declared by sub. (2) of the statute is to promote or encourage the creation of co-operative associations and nonprofit corporations to engage in the production, transmission, distribution, and furnishing of light, heat, water, or power, or the rendering of street or interurban railway or

bus service. What is said above relating to sub. (1) applies in the main here. It is not a public purpose to encourage the creation of co-operatives or nonprofit corporations to engage in any of these activities. It doubtless would be a public purpose to encourage and promote associations of persons to engage in these activities, as this would tend to extend the benefits of utility service to the people of the state. But to bring a statute for the encouragement or promotion of the creation of utilities within the purview of a public purpose, it must include not only co-operatives and nonprofit associations, corporations, but all other classes of associations and corporations organized for profit. To include co-operatives and nonprofit corporations and exclude associations and corporations organized for profit is to deny equal opportunity.

Passing to sub. (5) of sec. 199.03, Stats., the making of the surveys there provided for would be for a public purpose if the result of the surveys made were made available to the public. However there is nothing in the chapter making the results available to any one except the Wisconsin Development Authority itself. The information secured can be kept secret. The provision was manifestly made to enable the corporation to make use of the information thereby procured in furthering the purposes declared by subs. (1), (2), (3), and (4) of sec. 199.03, Stats. The information so secured could in fact be used by the Wisconsin Development Authority in establishing plants to be owned and operated by itself. By sec. 199.06, Stats., the corporation is required to report annually to the governor its activities in the prosecution of which state funds are used, but there is here no requirement for reporting the information secured and no requirement that the governor shall make the contents of the report known or available to the public. In this situation I do not perceive that any public purpose is disclosed or will be served by the prosecution of the activities referred to.

Sub. (6) relates to the collection and dissemination of information necessary or useful in carrying out the purposes declared by subs. (1) to (4), inclusive. The subsection makes no provision for dissemination or making available information to the public generally, but implies dissemination and availability to the communities in which the corporation engages in its work of creating nonprofit organizations or promoting acquisition of utilities by municipalities. No public purpose is here disclosed.

Sub. (7) would devote funds to the Wisconsin Development Authority to aid it in co-operating with the federal government and its agencies in creating electrical utilities in rural and perhaps other localities. It is the view of the court that extending utility service to any particular community is not a state-wide public purpose and public funds cannot be appropriated therefor. The federal government is engaged in extending electrical service to particular communities. The state can no more authorize the expenditure of money by the Wisconsin Development Authority in aiding the federal government to extend such service to particular communities than it could authorize it to use public funds to prosecute such work itself.

As I understand the opinion of the court on rehearing it would permit the Wisconsin Development Authority to send out literature and lecturers to preach the advantages of utilities owned and operated by co-operatives, nonprofit corporations and associations and power districts over those owned and operated for profit, and the advantage of municipally owned and operated utilities over those privately owned. Whether the one class has any advantages over the other is a highly controversial question upon which people differ. It is no function of government under our constitution so to preach against privately owned and operated utilities. It is mere propaganda as distinguished from dissemination of

information to the public. It is in effect the advocacy of the belief of a part of the·people on the question of private as against public ownership as correct and the belief of another part of the people on that subject as incorrect. Such advocacy being no function of government, public money cannot be expended in aid of it.

I understand it to be the opinion of all members of the court—anyhow it is my opinion—that it is no function of government under our state and federal constitutions to advocate the principles of any political party, and public funds cannot be expended for that purpose. The platforms of the political parties that participated in the last election are on file in the legislative reference library. We may, as I understand, take judicial notice of these files. I have read the platforms. One party (Socialist) proposes in its platform "to replace the profit system" and declares that "the one thing that keeps us from the security which can be ours is the profit system." Another (Farmer-Labor-Progressive Federation) favors "the establishment of public corporations similar to the TVA to perform such functions of government as the welfare of the people makes necessary," and "a program of rural electrification through public or co-operative enterprise or both." Another (Progressive) declares that "Progressives believe that public utilities should be publicly owned." "An ounce of public ownership is worth a pound of public regulation." "Progressives pledge their candidates to make this platform their guide in drafting legislation." The statute involved purports to authorize the Wisconsin Development Authority to use public funds to advocate the adoption, in part, of the programs of these parties. The purpose of the act to favor nonprofit associations and corporations over profit-sharing associations and corporations is plain. Its purpose to favor municipally owned as against privately owned corporations is plain. The act appropriates to the Wisconsin Development Authority up to $60,000 a year after the first

year of its operation for furthering the purposes of the act. To me it seems clear that even as interpreted by the opinion of the court on rehearing the act appropriates public money for the advocacy of the principles of a political party.

The opinion of the court on rehearing seems to imply that it is constitutional to "favor" co-operatives over ordinary corporations in respect of the ownership and operation of utilities, and cites several statutes and two decisions of this court as supporting the proposition. The statutes cited have never been construed by the court as the opinion concedes. In the first case, *Northern Wis. Co-operative Tobacco Pool v. Bekkedal,* 182 Wis. 571, 197 N. W. 936, there is a mere statement on page 582 of the opinion that "Co-operative associations among the farmers are favored by our law." No authority is cited in support of the proposition, no reason is offered in support of it, nothing is said as to how or in what respect co-operatives are favored. In the other, *State ex rel. Saylesville C. Mfg. Co. v. Zimmerman,* 220 Wis. 682, 265 N. W. 856, the question involved related to a change of venue. Sec. 185.08 (9) provides that the proper place of trial of a case by or against a co-operative that is "under the foregoing provisions of the section" is where the co-operative has its principal office. The opinion points out the different provisions as to venue in case of various kinds of corporations when they are defendants, and that the instant action involved a case under sec. 185.08, Stats., and upheld the provision as not violative of the Fourteenth amendment, and cited provisions of the state constitution, and distinguished the case from a decision of the supreme court of the United States, *Power Mfg. Co. v. Saunders,* 274 U. S. 490, 47 Sup. Ct. 678, 71 L. Ed. 1165, which held a state statute unconstitutional that fixed the venue of actions against a foreign corporation as any county of the state while the venue of actions against domestic corporations as a county where found or doing business or

where they had a representative. This does not appear to me to imply that a statute authorizing expenditure of public money for any of the purposes declared in ch. 199, Stats., is constitutional. Nor does the *Bekkedal Case, supra,* so declare. Nor do any of the statutes cited in the opinion so declare. More to the point is *Weco Products Co. v. Reed Drug Co.* 225 Wis. 474, 274 N. W. 426, wherein we held unconstitutional the provision of the Wisconsin Fair Trade Act exempting co-operatives or nonprofit associations from the provisions of the act. Whether co-operatives may be favored depends on what is meant by "favor," whether the favor extended violates a constitutional provision. Whenever the "favor" extended does violate a constitutional provision, as does the instant one in my opinion, the extension of it is unconstitutional.

The severability clause of ch. 199, Stats., is considered by the court as saving the provisions of the act other than subs. (3) and (4) of sec. 199.03. I think the main outstanding purpose of the act is that expressed by these two subsections. At any rate the dominating purpose is expressed by subs. (1), (2), (3), and (4). The scheme and purpose of the act manifestly is to encourage and promote co-operative and nonprofit corporate enterprises for furnishing electrical service and to encourage and promote acquisition of existing utilities by municipalities. This is what the $60,000 per annum was appropriated for. It was not intended to authorize the devotion of such sum as that to the mere purpose of making surveys and disseminating information. No such appropriation would have been made for the limited activities covered by subs. (5) and (6). Nor would the act have been enacted if its purposes had been so limited. Where the dominant purpose of a statute is unconstitutional it will be declared unconstitutional as a whole notwithstanding it has a severability clause. When this is the situation the

declaration of severability will not save any portion of the statute. *Water Power Cases,* 148 Wis. 124, 152, 134 N. W. 330; *Brittingham & Hixon L. Co. v. Sparta,* 157 Wis. 345, 147 N. W. 635; *State ex rel. Reynolds v. Sande,* 205 Wis. 495, 503, 504, 238 N. W. 504; *State ex rel. Hickey v. Levitan,* 190 Wis. 646, 210 N. W. 111. Severability clauses were contained in the statutes involved in the *Water Power Cases* and in the *Levitan Case* above cited. The *Sande Case* goes upon the accepted proposition that if after elimination of invalid portions of an act it appears that the legislature would not have enacted the valid part the whole statute is void, and the *Sparta Case* recognizes the correctness of the proposition.

For the reasons above stated, I think that all of the original mandates should stand even though based upon erroneous view.

FAIRCHILD, J. (*dissenting*). I cannot convince myself that this court was wrong in the position unanimously taken at the first hearing. The law in question certainly bestows upon this private corporation power to act as only an officer may act. The point now made is that it had all these powers by reason of its articles of incorporation and that this act simply appropriated money. But in addition to the powers enumerated in the original opinion, the act gave the corporation the power to commandeer certain resources of the state. It is empowered to call upon the public service commission to obtain information. Sec. 199.04, Stats., provides:

"In the performance of its duties and functions under section 199.03 Wisconsin Development Authority shall have access to all available information collected by any department of the state and may call upon the public service commission to obtain further information. The public service commission is hereby authorized to gather such information

under section 196.02. The governor may direct that assistance and advice be given said corporation in the performance of its duties and functions under section 199.03 by any officer, agent or employee of any department of the state."

The corporation may, with the consent of the governor, compel the services of officers of the state, and to say that this does not confer power is to overlook the plain meaning of language. This subject is further considered in the concurring opinion of Mr. Justice FRITZ.

There is much in the opinion of the court as now expressed by Mr. Justice WICKHEM over which there can be no controversy. The same is true of the dissenting opinion by Mr. Justice FOWLER. I agree that there is no occasion for the feeling of uncertainty which has distressed certain *quasi*-public corporations with respect to the appropriations upon which some of them depend entirely for their support. But were it otherwise, and were it necessary to say that some of these appropriations are unlawful, we ought not to hesitate to say so if they were plainly contrary to the constitution. In the case of *Erie R. Co. v. Tompkins* (1938), 304 U. S. 69, 77, 58 Sup. Ct. 817, 82 L. Ed. 787, in discussing the abandonment of the doctrine of *Swift v. Tyson,* 16 Pet. 1, 10 L. Ed. 865, Mr. Justice BRANDEIS said:

"If only a question of statutory construction were involved, we should not be prepared to abandon a doctrine so widely applied throughout nearly a century. But the unconstitutionality of the course pursued has now been made clear, and compels us to do so."

Can there be any doubt as to the truth of the proposition that no one is to be the favorite of the government except as advantage may be an incident of public welfare and consistent with public purpose? As pointed out in the present majority opinion, all agree that it is unlawful to take the money of taxpayers in one part of the state and divert it to the special

use of citizens of another part. Under the force of this rule, the court has eliminated from the act the right to use the appropriated money to engage in local campaigns, and has added to the law a requirement that the information gathered by this private corporation shall be made available to the public. The legislature, however, made no such provision. Can it be seriously contended that this court is authorized to fix the details and provide the machinery that is to be used in disseminating all this information throughout the whole state?

A brief review of the act will convince anyone that the purpose of the legislature was to place in the field a militant agency, aggressively devoted to the building up of organizations to compete with privately owned utilities, bus, and interurban operators. The result of the present decision is that the agency cannot operate as intended by the legislature, but that in its stead there may be an educational institution to benefit all concerned, including the very privately owned companies it was calculated to oppose. I agree with Mr. Justice FOWLER that the doctrine of severability does not save the law. I think it will not be seriously contended that the legislature had any thought or purpose of establishing another educational institution. If it had, it doubtless would have given some consideration to sec. 1, art. X, of the constitution, which provides:

"The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law. . . ." See secs. 185.08 and 40.22 (12), Stats.

Education in a democratic government must necessarily be nonpartisan, presenting the merits of both sides of a question. It seeks to promote and encourage clear thinking and good citizenship; but it does not seek to promote and

encourage the activities or accomplish the objectives of a party. The purpose of education is to inform the people, in order that they may form their own convictions. If it is proper to appropriate public money in furtherance of public ownership, no reason is apparent why it would not be proper to require the teachers in our schools to join in the encouragement and promotion of public ownership.

The majority opinion relies upon practical construction, legislative precedents, and the course and usage of government. Public money has been appropriated to various societies to enable them to promote and encourage projects of public interest, but so far as I know this has never been done where the effect would be to influence the minds of voters on matter of public controversy. There has been no opposition to horticulture, to cranberry growing, to cheesemaking, or to the preservation of historical records. To promote and encourage these things is to promote and encourage the good of all the people at the expense of no particular group. There comes to mind but one instance in which there may have been a detriment to a particular group of interests, namely, the use of public money to encourage and promote the formation of co-operatives. One such instance does not constitute a course and usage of government.

The majority has declared:

"An appropriation cannot be sustained to enable the Wisconsin Development Authority to go into a municipality and to promote, encourage, or agitate for the construction of a plant or the acquisition of an existing plant by that municipality or by any group of citizens therein, however organized. To appropriate funds to be so used is to devote the funds of the taxpayers generally to the promotion of a matter that is not of state concern. This is particularly true with reference to municipal ownership because that question is determined universally by a referendum. . . . For the state to throw the weight of the taxpayers' money into the scales upon an election to determine a purely local and pro-

prietary question cannot upon any theory or principle be considered an appropriation for a state purpose."

In spite of this language, the majority has concluded that the purposes defined in subs. (1) and (2) of sec. 199.03, Stats., are public and state purposes—

"and that they are to be construed to authorize encouragement of co-operatives and power districts by general educational activities of the sort permitted in the case of agricultural co-operatives, but not to authorize agitation for or organizational activities directed to the creation of any particular power district or co-operative."

How is it possible to encourage the formation of municipal power districts *in general* without encouraging the formation of particular power districts? Municipal power districts have already been formed in some localities; they cannot benefit by the promotion work. But in certain parts of the state, formation of power districts may be under consideration. How is it possible to encourage the formation of power districts *in general* without throwing the weight of the taxpayers' money into the scales upon an election to determine a purely local and proprietary question? Sec. 198.03 provides for an election to determine in a particular locality whether a municipal power district shall be formed. If any of the promotional activities of the Wisconsin Development Authority have been carried on in a particular locality prior to such an election, the taxpayers' money has influenced that election, regardless of whether the same promotional activities have been carried on elsewhere. Is it proper for the state government to influence a local election, to take sides upon controversial issues of local importance, provided only that it always takes the same side wherever such an election may be held? Multiplication of wrongs cannot make a right.

Must the Wisconsin Development Authority foresee the holding of an election in a particular community, and there-

after refrain from sending its representatives, its literature, its one-sided information, its encouragement into that area? May it spend the public money only so long as it accomplishes none of the results desired by the legislature?

The *Tuttle Case* is an illustration of the impracticability of auditing the claims of Wisconsin Development Authority in such a way as to prevent the use of public money for the private objects of the corporation. The majority opinion concedes that the particular letter served both a state and a private purpose, but approves the use of public money to defray the entire expense. Does this result make it possible for public money to be used for the private purposes of Wisconsin Development Authority whenever the private purpose is coupled with a public use? The authority may gather information at public expense. Under the majority opinion it must make that information available to the public. But the information cannot possibly be made as readily available to all as to the Authority, which will have it on file in its own office. The Authority may employ the services of technical experts; may it not use any part of their time for its own purposes? Must the secretary of state make an investigation whenever a claim for expense or salary is presented?

It is my opinion that the decision has written a law so different in character and detail from the effort of the legislature that it is no longer the same law. This seems to me to require an adherence to the original mandate. If the people desire to use public money for the discouragement of profit-making enterprises, a constitutional amendment would afford them the opportunity to pass valid legislation. The people are the ultimate source of power, and the issue should be framed and settled in the manner contemplated by the constitution.